This is an appeal in an action by Henry Biener against St. Louis Public Service Company, to recover damages for personal injuries sustained by him while a passenger on one of defendant's streetcars, which collided with another streetcar owned and operated by the defendant. The accident occurred at the intersection of Twenty-third and Olive Streets, in the City of St. Louis, Missouri, on September 21, 1940. The trial below resulted in a verdict and judgment in favor of the plaintiff in the sum of $3,750, from which judgment defendant has appealed.
The first amended petition, upon which the case was tried, pleads general negligence charging that while the streetcar on which plaintiff was a passenger was standing, a violent collision occurred between said streetcar and another of defendant's streetcars. The answer of defendant was a general denial.
On the voir dire examination, and in the opening statement, counsel for defendant admitted defendant's responsibility for the collision, but did not admit that plaintiff was injured.
The evidence showed that at the time of the accident the streetcar in question was headed east and was stopped at the intersection of Twenty-third and Olive streets, when it was run into from the rear by another eastbound streetcar. Plaintiff testified that the impact threw him forward against the seat in front of him, and then backward into the seat in which he had been riding.
William Walker, another passenger, testified that when the streetcar reached the intersection of Twenty-third and Olive streets, it came to a stop, and while the car was standing still, there was an impact, a terrific lurch. He stated he could feel the effects of the impact or collision; it was strong and very noticeable; his stomach was "pretty considerably upset" as a result of the collision. He also stated that he did not go to work until the following Monday afternoon; that he was pretty well shaken up, and his stomach was pretty well upset. On cross-examination he testified that he did not see any broken glass in either streetcar, but saw quite a dent in the apron at the rear end of the streetcar on which he was riding. He further stated that there were stop lights on the rear end of the streetcar, which were burning, and that the glass was not broken in either one of them. He further stated that he was not treated by a doctor for any injuries.
Ira L. Gourley, the motorman of the streetcar which was struck, testified for defendant. He stated that when he reached Twenty-third Street he stopped to permit two passengers to alight; that he released the brakes on the car, which was standing still on a downgrade when the collision occurred; that as a result of the collision his streetcar was moved forward about 4 feet. He stated that at the time he was seated on a swivel chair, which had a padded cushion on its back, and that he was not thrown off the chair. There was no glass broken in the streetcar, and no damage was done that he could see. He would not call the collision "quite a jar," but it made some noise.
Cleveland Skaggs, the operator of the other streetcar involved, also testified for defendant. He stated that no one in his car claimed to have been hurt as a result of the collision; that the glass in the headlight of his car was not broken, nor was the windshield cracked or broken, nor were the four lights on the car ahead nor any windows in the back of the streetcar with which he collided broken; that the car ahead was moved forward very little.
Defendant brought out in the cross-examination of Police Officer Krueger, plaintiff's witness, and in the direct examination of Police Officer Newman, defendant's witness, that the officers did not see any broken glass in the streetcar nor any damage to the streetcar.
It will thus be seen that one of the contested issues of fact in the case was whether or not the impact of the collision was sufficient to cause injury to anyone in the streetcar at the time.
For plaintiff, there was testimony that Miss Elizabeth Downs was also a passenger on the streetcar at the time it was struck and that she also complained of being injured. The admission of certain testimony *Page 783 
with respect to her forms the basis of appellant's first assignment of error. The evidence shows that she was taken by police officers from the streetcar to the City Hospital. This testimony was given by Officer Krueger, who testified for plaintiff. The evidence went in without objection by defendant. On cross-examination of this witness, the following testimony was brought out:
"Q. This lady, when you took her to the City Hospital, did she remain there? A. She refused medical attention. Then she sat in the waiting room and waited for somebody to come and get her.
"Q. After you took her there she refused medical attention and waited in the waiting room for someone to come for her? A. That's right. I called up her home for her; helped her out to go home."
Thereafter plaintiff placed on the stand Herman Barken, who testified that he was attorney for Miss Downs, who at the time of trial was in Topeka, Kansas. Barken was asked the following question, to which counsel for defendant objected on the ground that it called for hearsay testimony, was irrelevant, and was immaterial to the issues being tried: "Q. Do you know, of your own knowledge, whether she was ever confined to the hospital following this accident?" The objection was overruled and exceptions were saved. Barken answered: "Yes; I know she was confined at the Missouri Baptist Hospital on the 22nd day of September. She stayed there for a week."
In its brief, appellant contends that the foregoing evidence, admitted over his objection, was prejudicially erroneous because it injected immaterial, irrelevant, and collateral issues into the case, which could only tend to confuse and mislead the jury.
To ascertain whether the evidence was immaterial and irrelevant, it is necessary that we consider whether or not it may be said to logically tend to establish any fact in issue between the parties.
In Jones Commentaries on Evidence, Sec. 587, it is said:
"Applied to testimony, the meaning of the word `relevant' is that the particular testimony directly touches upon the issue which the parties have made by their pleadings, so as to assist in getting at the truth of it. Thus it is said: `Whatever testimony was offered, which would assist in knowing which party spoke the truth of the issue, was relevant; and when to admit it did not override other formal rules of evidence, it ought to have been taken.' It is not necessary, however, that the particular evidence should, in itself, bear directly upon the point in issue, for, though it is but a link in the chain of evidence tending to prove the issue by reasonable inference, it may nevertheless be relevant.
"In the courts there have been several attempts to get closer to a pregnant definition. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. Evidence is admitted, not because it is shown to be competent, but because it is not shown to be incompetent. No precise and universal test of relevancy is furnished by the law. The question must be determined in each case according to the teachings of reason and judicial experience. `If the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury. The question as to its admission or rejection addresses itself to the court as one to be answered with a view to practical, rather than theoretical considerations. One fact is relevant to another fact whenever, according to the common course of events, the existence of one, taken alone or in connection with other facts, renders the existence of the other certain or more probable. According to Stephen, `the word "relevant" means that any two facts to which it is applied are so related to each other that according to the common course of events, one either taken by itself or in connection with other facts proves or renders probable the past, present or future existence, or nonexistence of the other.'"
See also our opinion in Ismert-Hincke Milling Co. v. Mercurio Bros. Spaghetti Mfg. Co., Mo.App., 243 S.W. 408, 410, where we say: "Nothing that is necessary for the court to know in order to reach a just conclusion in a given case can be said to be irrelevant and immaterial."
In the case at bar, the extent of plaintiff's injuries was the sole issue being tried. As bearing on that issue, the defendant's counsel sought to establish by evidence and by cross-examination of plaintiff's witnesses that the force of the collision was so slight that it was unreasonable to suppose that plaintiff could have *Page 784 
suffered the serious injury he claimed as a result of it. Plaintiff, on the other hand, by his evidence, tried to establish the fact that there was a violent impact, and he contends here that the evidence complained of tended to corroborate that theory. We believe the evidence did bear directly upon the issues and that it was logically relevant. We believe that the inference from this evidence, that the collision was of such severity as to likely cause injury, was so plausible and direct that it became desirable to consider it in corroboration of plaintiff's other evidence to that effect. In other words, it was legally relevant and was properly admitted unless it was rendered inadmissible by some other exclusionary rule of evidence. In this conclusion we are supported by respectable authority. See Gaty v. United Rys. Co., Mo.Sup., 251 S.W. 61; Anderson v. Davis, 314 Mo. 515,284 S.W. 439; Davis v. Fleming, Mo.App., 253 S.W. 798; Lamar v. Panhandle S.F.R. Co., Tex.Com.App., 248 S.W. 34; Benedetto et ux. v. Hudson M.R. Co., 156 A. 37, 9 N.J.Misc. 758; Tennessee Coach Co. v. Young, 18 Tenn.App. 592, 80 S.W.2d 107.
The only rule of exclusion which defendant has invoked is that which forbids excursions into collateral matters. As to what is meant by the word "collateral", when used without qualification, is not readily apparent. It has two meanings as pointed out by Wigmore on Evidence, Sec. 39, where the author says:
"The term `collateral', sometimes here employed, has two senses, and is apt to mislead unless they are discriminated.
"(1) The original and dominant sense of `collateral' as here applied (its application to the impeachment of witnesses — post, sec. 1021 — being a totally different one) is that of `immaterial.' According to the principle of sec. 2, ante, no propositions can be evidenced except those which are properly in issue under the substantive law and the pleadings; hence, a fact evidencing a proposition not thus properly in issue is inadmissible, because immaterial. This it was at one time common to designate by the crude term `collateral.'
"(2) But occasionally the term was used to signify `remotely probative', or `indirectly connected', i.e., directed to prove a proposition in issue, and yet possessing for that purpose a weak quality or relevancy; thus the fact might be possibly relevant, if a close enough connection and a real probative value should appear.
"The practical difference between these two senses was that in the former sense the fact was always and clearly inadmissible, while in the latter sense it might become admissible under some circumstances. A fact might thus deserve different fates, according as it was `collateral' in one or the other sense. This careless confusion of usage spread, until a kind of stigma began often to be intended in the epithet `collateral'. It was appealed to in one sense in order to gain an argument involving its other sense. If an opposing counsel could stigmatize an offered fact as `collateral', he felt that he had struck a blow at its admissibility; and in this effort he had useful weapons, in the older passages in which a `collateral' fact, meaning an immaterial fact, was treated as necessarily inadmissible.
"What is needed, therefore, is simply a mutual understanding of the sense in which the term is being used on a particular occasion. When it is used in the second sense to express remoteness of probative value, the fact in question may or may not be admissible, according to the standard judicially declared in sec. 38, ante; there is nothing decisive in its `collateralness.'"
In its brief appellant argues that the evidence could only tend to confuse and mislead the jury, so we conclude that he uses the term in the second sense above pointed out, i.e., that though logically relevant it should have been excluded on grounds of policy because its confusing qualities outweighed its probative value. A respectable argument can be made on this point, but such argument is properly addressed to this court only when the trial court by its ruling is guilty of an abuse of discretion in the admission of it. The rule applicable is stated in Jones Commentaries on Evidence, Sec. 588, as follows: "Evidence may be relevant, and yet its relevancy may be so slight and inconsequential that to receive it would be to distract that attention which should be concentrated on vital points, and to confuse rather than to illuminate the case. In determining whether any particular testimony offered on a jury trial belongs to this category or not, a certain discretion is necessarily vested in the presiding judge, and the very purpose and aim of this vested discretion is to restrain *Page 785 
the field of inquiry to its proper scope and to prevent the issues from becoming be-clouded to the confusion of the jurors."
The question then presented is whether the trial court abused its discretion in not ruling out the evidence objected to by appellant herein, on the ground that it was of such weak probative force that it tended more to confuse than enlighten the jury. In determining this question it is proper to consider the character of the issues and the testimony theretofore adduced. Defendant's attorney, by the cross-examination of plaintiff's witnesses, tried to create the impression in the minds of the jury that the impact was of so slight a character as not to have caused serious injury to plaintiff. When officer Krueger was on the stand, defendant's counsel brought out the fact that Miss Downs had refused medical attention at the City Hospital, and that she went home shortly after arriving there. It was also brought out on cross-examination of Krueger that he did not see any broken glass in the streetcar involved, nor any damage to the streetcar whatever, and that he so stated in his report of the accident. It further appears that after Officer Krueger was excused as a witness, the defendant placed on the stand Officer Newman, who also testified that he did not observe any damage to the streetcar or any broken window glass. Plaintiff and his witness, William Walker, were also interrogated on cross-examination with respect to damage to the car, and plaintiff was asked if he did not know that Miss Downs refused to permit those at the City Hospital to examine her but went home immediately after arriving there.
The whole scope of the cross-examination by defendant's counsel of plaintiff and his witnesses was directed toward creating an inference that Elizabeth Downs was not injured, and that the force of the collision was not such as would likely injure anyone. This was the state of the record when the alleged objectionable question was put to witness Barken, and when the trial court was called upon to exercise his discretion, that is, to pass upon the question of whether the probative value of the evidence called for was so slight and inconsequential that to receive it would have been to distract the minds of the jury from the vital points at issue.
No precise and universal test is furnished by the decisions to determine this question, but the question must be determined in each case according to the teachings of reason and judicial experience, taking into account the character of the evidence, the issues in the case, the prior testimony, and last but not least, those considerations of fairness which should accord to the parties equal range in matters of this kind, if possible. In other words, where so-called collateral matters are once permitted, and where a subject is once gone into, without objection when first offered, as was done in this case, even though the relevancy be slight, if by limiting full inquiry an unfair advantage would accrue to one of the parties, the trial court should not be convicted of abuse of discretion by allowing full scope to the inquiry, unless to do so would so confuse the jury that an intelligent consideration of the case would be prevented. The effect of ruling out the evidence complained of by appellant herein would have been to deny respondent the right to rebut the prejudicial effect of evidence brought out by appellant in his cross-examination of Officer Krueger, thus denying respondent equal range with respect to a matter which, though collateral, was logically connected with the main issue in the case.
From an examination of the issues and evidence appearing in the record before us, we are of the opinion that the Trial Court did not err in refusing to rule out the evidence complained of on the ground now urged by appellant. And, we are of the further opinion that even if the evidence complained of were of such weak probative value as to render its admissibility questionable, appellant is estopped from objecting to it, and the action of the Trial Court can be sustained on that ground alone.
In the case at bar plaintiff offered evidence that Miss Downs was taken from the streetcar, placed in an ambulance, and taken to the City Hospital. Whether the admission of this evidence was proper or not is not before this Court, for defendant did not see fit to object to it, but chose to break down its effect before the jury by showing that when Miss Downs reached the hospital she refused medical treatment and left immediately for her home. By this testimony defendant offered evidence of the same character as that offered subsequently by plaintiff, to which defendant objects and which defendant claims *Page 786 
to be inadmissible. If the latter were inadmissible as violative of the rule against admission of matters collateral to the main issue in the case, then defendant's prior evidence was likewise inadmissible. In such a situation we look with narrowing eyes upon defendant's objection, since plaintiff's evidence was offered to remove the damaging inference thus created, and we invoke against defendant the doctrine of curative admissibility, which is defined in Wigmore on Evidence, Sec. 15, in the following language:
"Does one inadmissibility justify or excuse another? If the one party offers an inadmissible fact which is received, may the opponent afterwards offer similar facts whose only claim to admission is that they negative or explain or counter-balance the prior inadmissible fact?
"If the opponent duly objected and was erroneously overruled in the first instance, he could not claim to present similar inadmissible facts, because his objection would (in theory) save him, on appeal, from any harm which may accrue, and he needs no other protection.
"But if he did not object and except, he has no such protection; and the question thus arises whether he can protect himself at the trial by retorting in kind.
"On this subject three different rules are found competing for recognition in the different jurisdictions.
"(1) The first is that the admission of an inadmissible fact, without objection by the opponent, does not justify the opponent in rebutting by other inadmissible facts.
"This rule is represented by some English authority and by a respectable number of American jurisdictions.
"(2) At the other extreme is a rule which declares that, in general, precisely the contrary shall obtain, i.e., the opponent may resort to similar inadmissible evidence.
"This rule has also ample authority, and is perhaps to be regarded as the orthodox English rule.
"(3) A third form of rule, intermediate between the other two, is that the opponent may reply with similar evidence whenever it is needed for removing an unfair prejudice which might otherwise have ensued from the original evidence, but in no other case. This seems to be the true purport of what may be called the Massachusetts rule.
"The source of these divergent views is apparent enough. By the Courts adopting the first rule the emphasis is placed upon the circumstance that the opponent did not in the first instance object; hence, his waiver of objection leaves him without ground for maintaining that the original evidence was a wrong which estops the original offeror from now objecting. By the Courts adopting the second rule, on the other hand, the emphasis is placed upon the original party's voluntary action in offering the evidence, by which he virtually waived future objection to that class of facts. Both these circumstances of waiver are true; it is simply a question of relative emphasis; hence the contradictory views. But it may be noted that under the first rule, in almost all the cases, the counter-evidence had been rejected below, while under the second rule, in almost all the cases the counter-evidence had been admitted below, i.e., the Courts under both rules reached practically the same result in that they refused to disturb the ruling below. This points to the true rule, namely, that since each party is alike in the condition of `volenti non fit injuria' neither can complain of a ruling either admitting or rejecting, — a waiver being predicable of both. The matter is thus left in the hands of the trial Court. Modify this in certain cases by conceding to the opponent, as of right, to use the curative counter-evidence when a plain and unfair prejudice would otherwise have inured to him, and the rule will be sufficiently flexible."
The Missouri Courts have adopted the third rule spoken of by Professor Wigmore. See Jones v. Werthan Bag Co., Mo.Sup., 254 S.W. 4; Rainier v. Quincy, O. K.C.R. Co., Mo.Sup., 271 S.W. 500, loc.cit. 502; Long v. F.W. Woolworth Co., 232 Mo.App. 417,109 S.W. 85, loc.cit. 91; Marts v. Powell, 176 Mo. App. 124,161 S.W. 871; and Enyeart v. Peterson, 184 Mo.App. 519, 170 S.W. 458.
Appellant next assigns as error that the Court erred in permitting counsel for plaintiff to request defendant to admit, in the presence and hearing of the jury, that plaintiff was a passenger on the streetcar, and that defendant was a common carrier of passengers, and owned and operated the streetcars involved in the accident. *Page 787 
The record shows that on the voir dire examination, counsel for the defendant in his statement to the panel, without any request from anyone, voluntarily admitted that plaintiff was a passenger on the streetcar involved in the accident, and further stated: "I admit to you that the Public Service Company is liable in this case for whatever injuries were sustained by this plaintiff. I am admitting that to you gentlemen now. * * * The only point I am contesting is the amount to which this man is entitled. By coming in and trying this case before you men I agree to permit you men to assess those damages, and I am asking you now if you will be fair in assessing those damages."
Later during the trial counsel for defendant made the following statement, in response to a request by plaintiff's counsel that he dictate into the record the admissions made to the jury on the voir dire, to which request no objection was made: "Mr. Cleary: I will admit that the St. Louis Public Service Company owned and was in charge of and operating the streetcars mentioned in evidence in this case; and I will further admit that the St. Louis Public Service Company is liable for the collision between the two streetcars."
Some colloquy between court and counsel then followed, and the matter objected to by appellant herein then occurred, namely:
"Mr. Habenicht: Will you also admit that the St. Louis Public Service Company, the defendant, was engaged in the business as a common carrier of passengers for hire, and was operating the particular streetcars mentioned in evidence?
"Mr. Cleary: Yes, I have already admitted that.
"Mr. Habenicht: Will you admit that Mr. Biener was a passenger in the car?
* * *
"Mr. Cleary: I am going to object to the action of counsel for plaintiff in requesting me to make certain admissions in the presence of and in the hearing of the jury. It is prejudicial to defendant, and I move that a mistrial be declared."
The court overruled the motion, and exceptions were duly saved by defendant's counsel.
We fail to see anything improper in the question put to defendant's counsel by the attorney for plaintiff, even though made in the presence of the jury, in view of the fact that it called for admissions of fact which had already either been made voluntarily by defendant's counsel, without any solicitation by plaintiff's counsel, or in response to a request previously made at which time no objection whatever was interposed. We rule the point against appellant's contention.
The next assignment of error is directed at the ruling of the trial court in refusing a request to discharge the jury for alleged misconduct on the part of plaintiff's counsel. The incident occurred during the cross-examination of witness Skaggs, who was the motorman of the streetcar which collided with the car on which plaintiff was riding at the time of the accident. He had testified on direct examination that none of the passengers on his car were injured or claimed to have been injured, and on cross-examination stated that he had turned into the company the names of all the passengers who were on the streetcar at the time.
Then the following appears:
"Q. And how many were on your car? A. I don't remember. You would have to look at the report and see.
"Q. I know, but I can't do that. I don't have that report, you see. What is your recollection as to the number of people on your car? A. I don't remember a thing about that, because that is past.
"Mr. Cleary: Give him your best judgment, that is what he wants.
"Mr. Habenicht: Let him look at his report to refresh his memory, if he wants to.
"Mr. Cleary: (out of the hearing of the jury) I am going to move for the discharge of this jury, in view of the remark just made by counsel, asking me to show this operator his report, in the presence of the jury. It is prejudicial to this defendant and can serve no other purpose than to bias and inflame this jury.
"Mr. Habenicht: That is not the purpose at all. It is to refresh the witness' recollection.
"The Court: I will overrule the motion.
* * *
"Mr. Habenicht: Q. What is your best recollection as to the number of people who were on your car? A. Well, I would *Page 788 
say there were at least six on there, maybe more. I don't remember."
We fail to see anything in the suggestion made by plaintiff's counsel that would be calculated to bias the jury or influence them against the defendant. The Court properly overruled the motion.
Appellant's final assignment of error is that the verdict and judgment are excessive. This necessitates a review of the evidence.
The accident occurred about 3:15 p.m. on a Saturday. Plaintiff remained on the car after the accident, continuing his journey and alighting at Sixth Street, in the downtown section of the city, where he visited a dime store and the Famous-Barr Department store, making purchases at each place. He had intended to call upon a friend who lived at Virginia and Magnolia Avenues in South St. Louis, but by the time he had made the purchases referred to above, his back was causing him so much pain that he concluded to go home. On arriving home, he went to bed and remained there, doing no work that evening or the next day.
At the time of the accident, and for several years prior thereto, plaintiff had been employed at St. Louis University as a waiter in a dining room. His compensation was at the rate of $50 per month, $20 of which was paid in cash, and he was furnished his meals and living quarters for the balance.
On the day following the accident, which was Sunday, plaintiff sought medical attention at Desloge Hospital. He was there given a physical examination, which included the taking of X-ray photographs of his back. After this examination, there being no vacant rooms in the hospital, plaintiff was advised to consult Dr. John P. Murphy, a specialist in orthopedic surgery and a member of the Desloge Hospital Staff. This he did the following Tuesday. Dr. Murphy examined him and advised that he go to a hospital. The doctor arranged for a room at St. Mary's Hospital, which plaintiff entered on September 26, 1940, remaining there until November 9, 1940. During his stay at the hospital he was continuously confined to his bed for the first three weeks. After that, and during the remainder of his stay at the hospital, he was permitted to be up for one-half hour each day. During his entire stay at the hospital, he suffered severe pain in his back. He also suffered severe headaches, and was unable to sleep well. When he left the hospital, he was taken to his brother's home in St. John's, Missouri, where he was living at the time of the trial, March 10, 1941, approximately 6 months after the accident. From the date of the accident to the time of trial plaintiff had been unable to do any work and had earned no money. His hospital bills amounted to $267.50 and his doctor bill amounted to $150.
Dr. Murphy appeared as a witness for the plaintiff, and testified that when plaintiff first called upon him he gave plaintiff a physical examination. At that time plaintiff complained of pain in his back from the region of the scapula, or wing bones, down to the lumbar, or lumbosacral joint, just above the coccyx. When asked to bend forward, plaintiff would state that he could not do so because of the pain. Upon this examination Dr. Murphy found rigidity to the muscles on both sides of plaintiff's spine, which was an objective sign of injury, and because of plaintiff's lack of co-operation, being unable to bend his spine, the doctor concluded that he could not get anywhere with office treatment, and so suggested that plaintiff be hospitalized. Plaintiff thereupon was sent to St. Mary's Hospital, where he remained 44 days, during which time he was given diathermy, which is a so-called heat treatment by electricity; and also some ultraviolet, or lamp, treatments. The doctor further stated that during the entire time that plaintiff was in the hospital, and particularly for the first week or two, he could not get much co-operation from plaintiff because of the pain in the back. On two or three occasions the doctor tried to get plaintiff out of bed for an examination, but was unable to because of plaintiff's complaints of pain. Later on, however, as the back condition cleared up, plaintiff was more co-operative. Plaintiff also complained of nervousness the entire time he was in the hospital. The doctor further testified that plaintiff at the time was suffering from a back sprain or strain, which is a stretching of the muscles. The plaintiff's injury was confined to the soft tissues and did not involve the bones or joints. The erector spinae muscles were involved, which are a group of muscles on each side of the spine running all the way up from the sacrum to the skull. To relieve the pain, plaintiff was given at different times *Page 789 
morphine, pantopon, aspirin, codeine, and luminal.
The doctor testified that at the time of the trial he could not find any considerable objective symptoms of injury, but that plaintiff was still complaining of pain, which might be due to the stretching of the individual fibrils of the muscles, which could occur without objective evidence. He stated that he saw plaintiff at least every other day at the hospital, and three or four times after he left the hospital, and that the reasonable value of his services was $150.
At the time of trial, plaintiff was still suffering from pain in his back, from headaches, and from insomnia, and was experiencing fearful dreams. His doctor had not fully discharged him. Dr. Murphy was not able to state with any degree of certainty how much longer plaintiff would be likely to suffer from pain in the region of the back. Neither would he prognosticate as to what the result of plaintiff's injuries would be in the natural course of events. The most he would say was that plaintiff would probably get along all right, but he did not know when.
In passing upon an assignment of error that a verdict is excessive, we must keep in mind certain well settled rules. In the first place, the Court must consider the question from somewhat the same angle as when passing on the question of whether an instruction in the nature of a demurrer should be given, namely, all the evidence which tends to support the verdict must be taken as true. Mickel v. Thompson, Mo.Sup.,156 S.W.2d 721, loc.cit. 729; Peterson v. Kansas City, 324 Mo. 454,23 S.W.2d 1045, loc.cit. 1049; Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S.W.2d 27, loc.cit. 30. It is also a fundamental rule that the appellate court should not disturb a verdict as excessive, unless it appears that it is grossly excessive. Mickel v. Thompson, Mo.Sup., 156 S.W.2d 721, loc.cit. 729. Bearing these rules in mind, we have carefully examined the evidence presented by the record, and have concluded that the case is not one which calls for the interference of this Court on the ground of excessiveness.
We find no error in the record. The judgment is affirmed.
HUGHES, P.J., and McCULLEN, J., concur.
 *Page 678