Maurice Baker v. Kansas City Public Service Company, a Corporation, Appellant.—No. 39084.—183 S. W. (2d) 873.

Division One, November 6, 1944.

Rehearing Denied, December 4, 1944.

*Charles L. Carr* and *Harding, Murphy & Tucker* for appellant.

630

*E. E. Thompson, Alfred H. Osborne* and *Thompson & Osborne* for respondent.

632

■■■

■■ BRADLEY, C.—Action for personal injury; verdict and judgment for $9,000 went for plaintiff; defendant appealed.

About 4:30 P. M., on August 25, 1941, plaintiff was driving his automobile north on Troost Avenue in Kansas City. In front of him were defendant's northbound street car and an automobile some 25 or 30 feet to the rear or south of the street car. Out to the right some 3 or 4 feet and 10 or 15 feet in front of plaintiff's automobile was a boy on a bicycle; and about 25 or 30 feet south of plaintiff was an automobile also traveling north. The northbound line of traffic, unless it was the boy on the bicycle, was traveling at 25 or 30 miles per hour. Shortly after plaintiff's automobile crossed 29th street in this line of traffic the northbound street car, for some reason not shown, suddenly slowed down. Thereupon the automobile next to the street car turned to the right in front of the boy on the bicycle; the boy turned to the left in front of plaintiff; and plaintiff turned to the left and onto the southbound ■■ street car track and before he got off the track his automobile was struck by defendant's southbound street car resulting in the injuries complained of.

Plaintiff alleged primary negligence and negligence under the humanitarian rule, but submitted the cause under the humanitarian rule only. Negligence under the humanitarian rule is alleged as follows: .

That defendant's operator "saw or by the exercise of ordinary care could have seen the plaintiff and his automobile on defendant's southbound track and in the position of peril and danger from the approach of defendant's said street car; in that defendant's said operator saw or by the exercise of ordinary care could have seen plaintiff and his said automobile on defendant's track or so near thereto as to be in the path of defendant's said street car and in a position of imminent peril and danger from the approach of defendant's said street car in time thereafter for defendant's said operator by the exercise of ordinary care to have stopped said street car or slackened the speed thereof . . . and thus and thereby avoided the afore-

said collision and the injuries to plaintiff, but defendant's said operator negligently failed so to do.''

The answer was a general denial, and alleged negligence on the part of plaintiff alleged to be ''the contributory cause or the sole, proximate and direct cause of any and all injuries that plaintiff may have sustained.''

Error is assigned: (1) On the refusal of defendant's demurrer to the evidence; (2) on the admission of evidence; (3) on plaintiff's instructions 1 and 3; (4) on argument of counsel; and (5) on an alleged excessive verdict.

The assignments on the refusal of the demurrer to the evidence and on the admission of evidence are so related that they may be considered together. Defendant says that plaintiff's expert witness on stopping or slowing down the street car was not qualified to give such evidence.

Plaintiff testified: ''The northbound street car and the automobile ahead of me were traveling, just before the collision, about 25 miles per hour; the street car made a sudden decrease of speed; the automobile in front of me made a sudden turn to the right; the boy on the bicycle made a quick turn to the left, getting right in my path which made me cut shortly to the left and onto the southbound track. When I got over to the southbound track, I had changed my speed from 25 to 20 miles per hour, because I applied my brakes; I would say I was going 15 miles per hour when I got on the southbound track; my left wheels were between the rails of the southbound track. When I got on the southbound track, the southbound street car was approximately 100 feet away, or maybe a little over, and was moving at about 25 miles per hour.'' Plaintiff said that when he swerved onto the southbound track, he then released his brakes; turned sharply to the right to try to get off the track; tried to gun it; that there was no change in the speed of the street car as it came south; that the left front of the street car struck his automobile at about the door on the left side; that he was moving northeast when hit.

Plaintiff's witness Pruitt was driving in the southbound traffic lane to the right and to the rear of the southbound street car. He said that when plaintiff swerved onto the southbound street car track, the southbound street car was 100 or 125 feet north of plaintiff and was moving between 20 and 25 miles per hour. Other witnesses for plaintiff testified that the southbound street car did not slow down prior to the collision, and one witness said that plaintiff was on the wrong side of the street for about 15 feet, that is, his automobile moved north about 15 feet, while astride the east rail of the southbound street car track. Morrison, the operator of the street car, testified that the street car was moving about 25 miles per hour when plaintiff cut out 75 feet away ''on the southbound track'', and that he (Morrison) ''at once gave it all emergency brakes'', and that the

street car stopped about 25 feet south of the point of collision. There was evidence that the street car did not stop till 100 feet south of the point of collision.

Robert Brumfield was plaintiff's expert witness on stopping or slowing down the street car and who, defendant says, was not qualified to give evidence on that subject. Brumfield testified: "Immediately prior to October 29, 1940, I was employed for 6 years by defendant as street car operator and bus driver. I operated street cars on Troost Avenue between 28th and 29th streets. I operated the 1400 type car. Since the new type street car (the 700 type) has been in use (July, 1941) on Troost, I have frequently ridden and observed its operation. I have been on the new type car several times when an emergency stop was made, and observed the operation on such occasions. In making the emergency stops of the new type car, the operator applied the brakes with his foot, with his foot pedal. The brake equipment on the new cars is very modern; it is applied by foot pedal; it is a dynamic braking equipment. They also had a magnetic braking equipment. The magnetic brake is a bar that drops down on the rail, entirely free from the wheel. The dynamic brake works on a principle of on the motors, electric motors of a car. The dynamic principle is a slowing up of the axle by the motors itself. It is comparable to the slowing down of an automobile when you take your foot off the gas.

"Q. Now then, Mr. Brumfield, I want to ask you, taking into consideration your experience in operating, say the 1400 type street car, for a number of years, and taking into consideration your observation and examination by observation of the new type street car and your experience while riding in them while making emergency stops, and state whether or not in your opinion the new type car, such as was in use on Troost Avenue in August, 1941, could be stopped in a less or greater distance (than the old type) under the same or similar circumstances at the same speed? A. In my opinion, I would say it could be stopped quicker than the old type cars." On hypothesized facts Brumfield gave it as his opinion that the southbound street car, at a speed of 20 miles per hour, could have been stopped with safety, etc., in 30 or 35 feet, and at a speed of 25 miles in 40 or 50 feet, and at a speed of 30 miles in 50 or 55 feet.

"Expert testimony is the opinion of a witness possessing peculiar knowledge, wisdom, skill or information regarding a subject matter under consideration, acquired by study, investigation, observation, practice or experience, and not likely to be possessed by the ordinary layman or an inexperienced person, and consequently who is incapable of understanding the subject under consideration, without aid of the opinion of some person who possesses such knowledge, wisdom, skill, practice or experience; and a person who is competent to give expert testimony is denominated as 'expert witness.'" McAnamy v.

Henrici et al., 238 Mo. 103, 1. c. 113 (and cases there cited), 141 S. W. 633. The question of the qualification of a witness to testify as an expert is a matter resting largely in the discretion of the trial court, and the ruling of the trial court on such question will not be overturned unless it appears that such discretion was abused. Arnold v. Alton R. Co., 348 Mo. 516, 154 S. W. (2d) 58, 1. c. 62, and cases there cited; Bebout v. Kurn et al., 348 Mo. 501, 154 S. W. (2d) 120, 1. c. 125-126, and cases there cited; Robison v. Chicago, Great Western R. Co. (Mo. App.), 66 S. W. (2d) 180 (certiorari denied). It will not be necessary to review these cases. It is quite clear, we think, that discretion was not abused in permitting witness Brumfield to testify on the subject of stopping the street car, and that the demurrer was properly refused.

The complaint on plaintiff's instruction No. 1 is that there was no substantial evidence upon which to base it. That question is ruled in ruling the assignment on the refusal of the demurrer to the evidence.

■ Defendant says that plaintiff's instruction No. 3 is bad because it "authorizes a recovery for plaintiff on a mere scintilla of evidence." In order to better appreciate this assignment it is necessary, we think, to make reference to defendant's sole cause instructions F, G, and H. Instruction F told the jury that if they found that plaintiff's manner of operating his automobile was the sole cause of the collision, then to find for defendant. Instruction G told the jury that if they found that plaintiff's violation of a city ordinance (in evidence) prohibiting the driving of a vehicle on the left side of the street was the sole cause of the collision, then to find for defendant. Instruction H was similar to Instruction G except that H was based on the violation of a city ordinance prohibiting the driver of a vehicle from following another vehicle more closely than is reasonable and prudent.

Plaintiff's instruction No. 3 told the jury that defendant's instructions F, G, and H "are what is known in law as *sole cause* instructions and that by the term *sole cause* is meant acts which were the sole cause of the collision without any contributing negligence whatsoever on the part of defendant's operator as submitted in (plaintiff's) instruction No. 1. Therefore, if you find that defendant's operator was negligent as submitted in said instruction No. 1, and thereby directly contributed *in any degree whatever* to cause the collision in question, then you cannot find the issue of sole cause referred to in said instructions lettered F, G, and H in favor of defendant" (italics ■ ours). The complaint on instruction No. 3 is leveled at the phrase *in any degree whatever*. Plaintiff says that these sole cause instructions did not properly hypothesize the facts, but, in the situation, we are not concerned with that question.

Hollister v. A. S. Aloe Company, 348 Mo. 1055, 156 S. W. (2d) 606, was a personal injury action submitted under the humanitarian rule. Defendant's truck collided with an automobile in which the plaintiff

was riding, and being driven by her husband. The defendant contended that plaintiff's injury was caused by the sole negligence of her husband, and such theory was submitted in the defendant's sole cause Instruction M. On behalf of the plaintiff the court gave instruction No. 5, as follows:

"The court instructs the jury as regards instruction M that said instruction constitutes what is known as a sole cause instruction, that is, it submits issues as to whether Dr. Hollister (plaintiff's husband) did not obey the stop sign and whether he drove to his left of the center of the street and thereby solely caused said collision, and in this connection you are further instructed that sole cause in this case means a collision occurring without any intervening and concurring negligence as submitted in instruction No. 1, and if you should believe Dr. Hollister did not obey said stop sign and so drove to his left of the center of the street, or either or both, yet if you further believe from the evidence that said truck driver was negligent in any respect whatever as submitted in said instruction No. 1 and thereby directly contributed *in any degree* to said collision, then you must find the issues under said instruction M, that is the issues of sole cause therein, in favor of plaintiff Mrs. Hollister and against the defendant company" (italics ours).

On appeal (in the Hollister case) the defendant assigned error on the plaintiff's instruction No. 5. Several complaints were made on the instruction, and among these was a complaint on the phrase *in any degree*. In ruling the point adversely to the defendant the court said [156 S. W. (2d) l. c. 610]: "Instruction number one told the jury the negligence that was necessary for them to find before they could return a verdict for respondent and that instruction told the jury that the collision must have been the 'direct result of the aforesaid negligence.' This was incorporated in instruction five by direct reference. Moreover, this instruction required the jury to find the negligence as defined in instruction one to be such negligence that 'directly contributed' to the collision. The point is without merit." It will be noted that instruction No. 3, in the present case, made specific reference to plaintiff's instruction No. 1 as to the negligence required to be found in order to find for plaintiff. But defendant says that "the point of proximate cause was raised" in the Hollister case, but that such is not the point here; that the point here is on "submitting degrees of negligence", and that such point was not raised in the Hollister case. We think the Hollister case, in effect, rules the question here.

In Dove et al. v. Atchison, Topeka & Santa Fe Ry. Co., 349 Mo. 798, 163 S. W. (2d) 548, l. c. 553, the court criticised an instruction on contributory negligence containing the language "directly contributed in any degree", but held that when all the instructions were read together such was not reversible error. The court said: "While

the matter of degree would better be omitted from such instructions because of the possibility of confusion or misunderstanding, this statement (by including the word 'directly') is not technically incorrect and it must be considered in connection with the definitions given and the facts submitted." In view of the evidence in the present case, and plaintiff's instruction No. 1, specifically referred to in instruction 3, we do not think that defendant was harmed by the phrase complained of in instruction 3.

During the closing argument plaintiff's counsel said: "Oh, how I wish we could have brought to you what is in those police records. We couldn't identify them, men in the service, men doing defense work away from town, but how I wish we could have given you men the advantage of the records of this city's police department." Objection to this argument was made on the ground that "all proper evidence went to the jury" and that such argument was improper. The objection was sustained and the jury directed to disregard such argument. Then defendant moved to discharge the jury, which was denied. In the brief defendant says that notwithstanding that the police vehicular report and the police diagram of the scene of the accident were excluded as hearsay, plaintiff's counsel "wilfully and in bad faith . . . gave the jury to infer that said police records were favorable to plaintiff . . . and, in effect, advised the jury that if defendant had not objected to them the jury could have considered such exhibits."

In the opening statement plaintiff's counsel told the jury that four officers were at the scene of the collision. That "some made pictures and some made measurements. As far as we are able to determine all four of those officers are in the service. We will have records here, however, including the pictures that will be brought in by the custodian of records. There is a possibility of one of the officers being available if we can get hold of him, but I don't know whether we can or not."

The vehicular report and the diagram from the police file were not before the jury, but there were before the jury an elaborate diagram of Troost Avenue between 28th and 29th streets and the immediate adjacent area east and west, and photographs taken at the scene. We think the refusal to discharge the jury was proper. Atchison v. Weakley et al., 350 Mo. 1092, 169 S. W. (2d) 914, l. c. 916; Gettys v. American Car & Foundry Co. et al., 322 Mo. 787, 16 S. W. (2d) 85, l. c. 90; Crews v. Kansas City Pub. Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54, l. c. 62.

Was the verdict excessive? Plaintiff's injuries are correctly stated in the brief to the following effect: Laceration of the left arm extending from just below the shoulder downward 17 inches to a point about the mid forearm; the triceps muscle was split and laid open. There was an injury to the ulnar nerve, which required an

operation for the purpose of transplanting the ulnar nerve. The laceration covered a width of about three inches on the surface of the arm; the olecranon or knob of the left elbow was fractured; he received a blow to the head and an injury to his back; he was taken from the scene of the accident to General Hospital in Kansas City, where he remained until about December 12, 1941. While at the hospital two operations were performed on his arm, one on the date of admission, which consisted of repairing the laceration and the insertion of a Stieman pin in the olecranon, and into the shaft of the ulna; thereafter his arm was placed in a cast. On November 12, 1941, an operation was performed to transplant the left ulnar nerve at the elbow. The ulna was fractured in two places, a fracture in the upper third and in the olecranon process; the latter was torn out; the fragments of the olecranon and shaft of ulna were wired together; the union of the fractures in the arm was bad, leaving a separation of a fragment of the olecranon from the ulna. Plaintiff was administered drugs to allay pain, consisting of codeine, aspirin, membutal, and morphine, daily until he was discharged from the hospital. At the time of trial on October 11, 1943, plaintiff had suffered permanent loss of 75% of the use of his left arm; also 20% loss of the use of his left shoulder. The muscles of the left arm and hand were somewhat atrophied and were in the process of disintegration; there was partial loss of the use of the left hand; the left arm, shoulder and hand were smaller than the right arm, hand and shoulder, which condition did not exist prior to receipt of his injuries. He had been subjected to considerable pain because of the type of injury to his nervous system and this painful condition was permanent.

Plaintiff was 40 years old and in good health when injured and was earning $40 to $45 per week. He had been earning that amount for about 8 or 9 months out of each year; he worked at odd jobs during remainder of year; he returned to work after the injury about the middle of March, 1942, thus losing 8 months from his work. After returning to work he was unable to work full time by reason of his condition resulting from his injuries, and up to the time of trial had averaged about three days per week. It was shown that he was not qualified by education or training for any kind of work other than labor work.

We do not think the verdict out of line with the rule of uniformity. See Coleman v. Rightmyer (Mo. Sup.), 285 S. W. 403; Schaefer v. Transamerican Freight Lines (Mo. Sup.), 173 S. W. (2d) 20; Kiefer v. City of St. Joseph (Mo. Sup.), 243 S. W. 104; Rose v. St. Louis-San Francisco Ry. Co., 315 Mo. 1181, 289 S. W. 913; Taylor v. Lumaghi Coal Co., 352 Mo. 1212, 181 S. W. (2d) 536.

The judgment should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by Bradley, C., is adopted as the opinion of the court. All the judges concur.