250 S.W.2d 859 (1952)
DORN
v.
ST. LOUIS PUBLIC SERVICE CO. et al.
No. 28359.
St. Louis Court of Appeals, Missouri.
June 17, 1952.
Motion for Rehearing or to Transfer to Denied September 5, 1952.
*860 Mattingly, Boas and Richards, Lloyd E. Boas, Edward F. O'Herin, St. Louis, for appellant.
Barnhart & Wood, C. V. Barnhart and Marvin S. Wood, St. Louis, for respondent.
Motion for Rehearing or to Transfer to Supreme Court Denied September 5, 1952.
ANDERSON, Judge.
Plaintiff, Columbus Dorn, brought this action against defendants, St. Louis Public Service Company, and Robert Triplett, doing business as St. Louis Cab Company, to recover damages for personal injuries claimed to have been sustained by him in a collision between a taxicab belonging to defendant Triplett, in which plaintiff was riding *861 as a passenger, and a streetcar of defendant St. Louis Public Service Company. The trial below resulted in a verdict and judgment in favor of the plaintiff and against St. Louis Public Service Company in the sum of $8,000, and in favor of defendant Robert Triplett. Thereafter, plaintiff remitted the sum of $500 from the verdict and judgment, and a new judgment was entered in favor of plaintiff and against defendant St. Louis Public Service Company in the sum of $7,500, and in favor of defendant Triplett. From this judgment, the St. Louis Public Service Company has appealed.
On this appeal the appellant alleges error in the trial court's refusal to admit certain evidence, and in the giving of Instruction No. 6.
The accident occurred on June 24, 1950, on Easton Avenue, in the City of St. Louis, at a point about sixty feet west of Grand Boulevard. Plaintiff boarded the taxicab in the 100 block of North Jefferson Avenue. Three other passengers were in the cab. The cab was driven west on Easton Avenue and came to a stop at Grand Boulevard in obedience to a traffic signal. At that time appellant's westbound streetcar was stopped in the east side of Grand Boulevard discharging and taking on passengers. When the traffic signal changed to "green" the taxicab proceeded west on Easton Avenue across Grand Boulevard and to a point about sixty feet west of Grand Boulevard, where it stopped. The driver of the cab, after crossing Grand Boulevard, signaled with his left arm for a left turn into Evans Avenue. The taxicab was in the westbound streetcar tracks at all times after crossing Grand Boulevard. A left turn into Evans Avenue could not be made immediately because of traffic moving eastward on the south side of Easton Avenue. The driver of the taxicab testified that after he had stopped his cab to make the left turn he saw the streetcar start from its position east of Grand Boulevard. Thereafter, the streetcar ran into the rear of the taxicab, knocking it forward several feet. The cab driver further testified that the head lights and tail lights on his cab were turned on and working properly at the time.
Gussie Brown, a passenger in the taxicab, testified that the taxi was standing still when it was struck, and had been stopped long enough for at least four or five eastbound cars to pass. Plaintiff testified that the cab had been stopped at least a minute and a half waiting for eastbound traffic to pass when it was struck by the streetcar.
Defendants' evidence tended to show that after the streetcar crossed Grand Boulevard, and was proceeding at the speed of ten or twelve miles per hour, the taxicab suddenly swerved onto the tracks, about ten feet in front of the streetcar, and made a sudden stop. The operator of the streetcar testified that when this happened he cut off the power and applied the brakes. He stated that the streetcar was moving five or six miles per hour when it struck the rear end of the taxicab, and moved about five or six feet after the collision. He further testified that traveling at ten miles per hour the streetcar could be stopped in fifteen feet; and at fifteen miles per hour the streetcar could be stopped in twenty feet.
Plaintiff was taken from the scene of the accident to the Homer G. Phillips Hospital. There he was examined and given some pills. No X-rays were taken. The next day plaintiff went to the Missouri-Pacific Hospital where X-rays were made which showed a fracture in his right shoulder. He returned to the Missouri-Pacific Hospital at intervals thereafter. On September 3, 1950, plaintiff returned to work. He was employed as a car washer for the Terminal Railroad Company. He worked only three days. He stated he could not continue to work because he could not use his arm. He again returned to work on September 28, 1950, at which time he was assigned lighter duties. He continued in this employment until February 5, 1951.
On June 27, 1950, three days after the accident, plaintiff consulted Dr. Vaughn C. Payne. The doctor testified that his examination of plaintiff on that date revealed pain and swelling in the right shoulder region and a contusion and swelling of the posterior scapula, also stiffness and pain in the muscles of the neck, the right arm, and right wrist joint. Dr. Payne on said occasion also took X-rays of plaintiff's right *862 shoulder. These X-rays revealed a comminuted fracture of the acromion process of the scapula with considerable separation of the fragments. On August 26, 1950, Dr. Payne took another X-ray to determine whether there was any union taking place at the fracture site. This X-ray examination revealed that there was no new bone being formed; that the broken fragment was completely detached and had not grown back to the parent bone. Dr. Payne testified to the effects of such an injury, stating it impaired the ability of plaintiff to elevate his arm, and would cause ache and pain for the rest of his life.
Dr. Payne further testified that to relieve the strain on the fracture he put plaintiff's arm in a sling, and gave him heat treatments to heal the bone and relieve pain. This treatment was continued until plaintiff returned to work in September, 1950, and occasionally thereafter during the fall season. About February 3, 1951, plaintiff again consulted Dr. Payne, and has been in the doctor's care ever since. Treatment has consisted of applying heat. The doctor advised plaintiff to quit using his arm so that his injury would have a chance to heal. It was Dr. Payne's opinion that plaintiff was disabled from performing his duties as a car washer and would never be able to do that work again. He stated that an operation could not relieve plaintiff's condition, but would worsen it. On cross-examination the doctor stated that the pain which plaintiff suffered was due to the continued pull on these fragments which were joined merely by a fibrous union. The doctor further testified that the condition was not unusual in a fracture of the type plaintiff suffered because the blood supply in that part of the body is less than is normal for other parts of the body. He stated that in his opinion the broken process would never heal because there will not be enough new bone thrown out to bridge the gap.
Dr. William A. Stephens examined plaintiff a few days before the trial. The trial started on March 19, 1951. He testified that his examination of plaintiff's right shoulder revealed no atrophy of the soft tissues, but did reveal considerable tenderness over the upper part of the shoulder, and that the acromion processes were crepitatious. He stated that while plaintiff had normal movement of the right shoulder, there was considerable pain when his arm was raised above the shoulder level. He also stated that plaintiff complained that his arm was weak, and that there was possibly some weakness of the deltoid muscle.
Dr. Stephens took some X-rays on March 15, 1951. At the trial he interpreted an X-ray film as follows:
"This is an anterior-posterior X-ray made of Mr. Dorn's right shoulder, and it shows the entire scapula, shoulder blade. It shows a portion of the clavicle, which is the collarbone * * * and it shows the upper one-half of the humerus and also a portion of the chest wall. Now, the only significant finding on this X-ray is the presence of a fragment of loose bone * * * that measures about roughly half an inch in length and perhaps half an inch in diameter, which is lying approximately over the head of the humerus and represents to me an old fracture of the acromion process, which is this part here of the scapula, which is un-united * * * the fragment had failed to unite to the parent bone."
The doctor further testified that one of the most important muscles, the deltoid muscle, which has the function of elevating the arm, is attached to the fragment of the bone that was torn away from the parent bone. He further testified that whenever the deltoid muscle is put in operation it has a pulling effect on the broken fragment of the bone and would cause pain. He further stated that he thought the likelihood of these bones being united was very remote; that the plaintiff's condition would be permanent; that the pain caused by this condition would continue for the rest of plaintiff's life, and might even grow worse.
On cross-examination, Dr. Stephens gave the following testimony:
"Q. Doctor, I understood you to say by your reference to a piece of loose bone up there that that was evidence of an old un-united fracture, is that correct? A. That is correct.

*863 "Q. Are you able to say from what you can see yourself and your examination, Doctor, of that X-ray, without resort to what you were told, when that fracture may have occurred? A. No, I think that would be very difficult to put a definite date on the thing. * * * because now if this individual had this fracture, injury, recently, one would expect some swelling and limited motion and muscle spasm and those other things that we speak of which would indicate the fracture was more recent; but this is not a few months; it may be years, * * * all I could do was to take the patient's word for it. I know that this fracture is old because when a fracture is fresh the fragment is sharp, has sharp corners, while this in this X-ray here shows the fragment to have smooth corners, so that there has been some absorption of bone about the fragment indicating that it has been there for quite some time * * * it is not that the bone fragments build up new bone to make it round, but it is rather absorption of the bone.
"Q. Now, Doctor, would you say from what you have seen in this X-ray and from your experience, how long ago this fracture was there? * * * A. I don't believe I could do that. * * * From that X-ray, I think that it is difficult to say, as I said before, to estimate the age of this fracture; it is an old fracture, that I know, but how old, I don't know."
Counsel for plaintiff read in evidence portions of the records of the Missouri-Pacific Hospital relative to the diagnosis and treatment of plaintiff's injury. The first entry was dated June 25, 1950, and the last entry read was dated February 9, 1951. There was no objection to the introduction of this evidence by counsel for either defendant. Just prior to closing plaintiff's case, his counsel stated: "At this time I desire to formally offer in evidence all of plaintiff's Exhibits from A to H-5, inclusive." Counsel for both defendants stated that they had no objection to the offer. The record discloses that plaintiff's Exhibits H-1, H-2, H-3, H-4, and H-5 were records of the Missouri-Pacific Hospital. Plaintiff's Exhibit H-1 contains the entries which had theretofore been read to the jury by plaintiff's counsel. Plaintiff's Exhibits H-2, H-3, H-4, and H-5 relate to prior treatments and have no relevancy to the issue on trial.
Defendant St. Louis Public Service Company called as a witness Dr. E. C. Funsch who had examined the plaintiff at his office on March 15, 1951. Dr. Funsch testified with reference to this examination and, among other things, stated that an X-ray examination of plaintiff's right shoulder taken at that time revealed a fracture of the acromion process of the scapula with some separation at that point. He gave further testimony, as follows:
"Q. Doctor, from the examination that you made, and the X-rays that you took, are you able to say when that fracture might have taken place? * * A. Well, I could say that it didn't happen, say within the last month, but whether it happened two months * * six months, two years, or five years, I couldn't say."
At this point in the trial defendant Public Service Company offered certain X-ray reports which respondent concedes were a part of the Missouri-Pacific Hospital records brought into court in response to a subpoena duces tecum served, at plaintiff's instance, on the record librarian of said hospital. These X-ray reports were not introduced into evidence by the plaintiff. The court sustained plaintiff's objection to this offer. Plaintiff's objection to this evidence appears in the transcript as follows:
"Mr. Barnhart: * * * I therefore object to any reference being made to the X-ray interpretation report because to do so would be to inject the opinion of an expert who is not present into the trial of this case and would give the jury the benefit of the opinion, of an expert, an expert opinion, without that expert being subjected to cross-examination, and the jury not knowing what his qualifications are, what his training was, in interpreting X-rays.
* * * * * *
"The Court: You certainly could not put in evidence any opinion of somebody *864 who is not here; if he is available as a witness, he would be able to testify; if there are some notes on those X-rays that the doctor should see in order to know what position they were taken in, or something like that, he should look at that, but they should not be put in evidence."
Counsel then had the X-ray reports marked "Defendant St. Louis Public Service Company's Exhibit 2," and the X-ray films were marked as said defendant's "Exhibits 3, 4, 5, 6, 7 and 8," and made a formal offer of proof of said exhibits. The court sustained the objection to the offer of proof of Defendant's Exhibit 2 "for the reason that it is clearly hearsay * * *."
Defendant's Exhibit 2 was in words and figures, as follows, to wit:

"Missouri-Pacific Hospital Association X-ray Report
Name Mr. Columbus Dorn Date 6-26-50
X-ray No. 6949 Room No. O.P.No. T 20385
No fracture or dislocation seen in roentgenograms of the cervical spine.
Roentgenogram of the right shoulder shows a fragment of bone broken from the medial superior aspect of the acromion process of the scapula with slight separation of the fragments. The margins of the fragments appear somewhat rounded probably due to the contour of this portion of the scapula, however, I am unable to entirely exclude the possibility that the changes may be old. If there are clinical manifestations of recent bone injury I advise immobilization.
 W. K. M. 6-28-50"
The next report, a part of defendant St. Louis Public Service Company's Exhibit 2, was dated July 21, 1950, and recited: "Roentgenograms of the right shoulder show the fracture of the acromion process without essential change in the position of the fragments since previous examination. Little evidence of new bone formation is seen at this time."
The next report was dated August 4, 1950, and stated: "Roentgenograms of the right shoulder show the fracture of the acromion process of the scapula without essential change in position of the fragments since previous examination. Bone density remains essentially the same and no evidence of new bone formation is seen at this time."
The next two reports, dated September 22, 1950, and November 16, 1950, were substantially the same as the previous reports. The last report was dated September 11, 1951, and recited: "Roentgenograms of the right shoulder show the old fracture of the acromion process as previously reported. There is marked absorption of the intermediary fragment. Bony union does not appear to have occurred. Bone intensity remains good."
Dr. Funsch was shown the X-ray film taken at the Missouri-Pacific Hospital on June 26, 1950, and testified that it revealed the fracture of the acromion process of the right scapula and showed that the edge of the fracture was smooth. The doctor further testified that the X-rays which he took at the time he examined plaintiff show the fracture of the acromion process healed by fibrous tissue instead of bone. He also gave the following testimony:
"Q. In your opinion, did that fracture occur on the 24th of June, 1950, from what you saw of those X-rays? A. No. * * * Because there isn't any change in the bone; the bone was smooth at that time; fractures are irregular, and it is in the same position, there hasn't been any change in the bone structure at all; whenever you break a bone it is just like you break a soft piece of wood, you have an irregular surface, little pieces on the edge, and nature has a tendency to dissolve those and heal it over; ordinarily in the healing of a bone nature throws out new callus; sometimes it doesn't throw out callus, and it is just bound there by scar tissue, just healing by fibrous tissue but not bone, which is this case. All those X-rays, the ones that you have there taken two days after the date of the accident and the ones I took just a few days ago show the same picture, which indicates that this man had a fracture there, but that fracture was old on the 26th of June."
*865 It also appears from Dr. Funsch's testimony that even though fibrous tissue is not shown on X-rays, the fact that all the X-rays showed the fragments of the bone in the same position indicated that there was a healing with fibrous tissue.
Appellant assigns as error the action of the trial court in sustaining respondent's objection to the introduction in evidence of the X-ray reports heretofore mentioned. These reports were a part of the records of the Missouri-Pacific Hospital Association, and contained evidence germane to one of the issues on trial. Respondent's objection at the trial, which the court sustained, was that the reports were inadmissible under the hearsay rule. In this court, respondent contends that the evidence was properly excluded because no proper foundation was laid for their admission under section 490.080 RSMo 1949, V.A.M.S.
The evidence disclosed that respondent, at some time prior to his visit to the hospital, suffered a fracture of the acromion process of the scapula. It was respondent's contention that said fracture was sustained in the collision which took place on June 24, 1950, between appellant's streetcar and the taxicab in which respondent was riding. However, there was evidence in the record from which the jury could reasonably find that the fracture was an old one which could not have been sustained in said collision.
Dr. Funsch, testifying for the appellant, stated that the X-ray film taken at the Missouri-Pacific Hospital two days after the accident showed that the bone at the fracture site was smooth, indicating an old fracture, and it was his opinion that the fracture did not occur on June 24, 1950.
Respondent's own witness, Dr. Stephens, testified that when a fracture is fresh the fragments of the bone involved have sharp corners, and in an old fracture the fragments have smooth corners due to absorption of the bone.
The first report sought to be introduced as part of appellant's Exhibit 2 recited that the margin of the fragments of the broken bone appeared to be somewhat rounded; and subsequent reports recorded the observation that there was no essential change in the position of the fragments.
It thus appears that the X-ray reports were relevant in support of appellant's contention, and that the exclusion of said records deprived appellant of corroborative testimony of great probative value.
As heretofore stated, the hospital records, which included appellant's Exhibit 2, were brought into court in response to a subpoena duces tecum issued at respondent's request. It also appears that respondent offered and read in evidence certain portions of this record without offering any proof as to their genuineness or testimony as to the manner in which they were kept. By so doing, respondent so far affirmed the admissibility of the records as to preclude him from objecting to appellant's offer of the remaining portions of the record. 20 Am.Jur., Evidence, sec. 931, page 784; Young v. Bank of the State of Alabama, 5 Ala. 179, 39 Am.Dec. 322; 32 C.J.S., Evidence, § 774, page 699. An objection to the admission of evidence is waived where the same or similar evidence has been adduced by the party objecting. 64 C.J., Trial, sec. 193, page 172. See also, 31 C.J.S., Evidence, § 190, page 913; Wigmore on Evidence (3rd Ed.), Vol. 1, sec. 15, page 304.
The evidence which appellant sought to introduce was of the same hearsay character as that offered by respondent. Neither party made any attempt to qualify the records as evidence admissible under section 490.680 RSMo 1949, V.A.M.S., and since respondent was the first to resort to hearsay in support of his cause, he is, under the circumstances, in no position to object to appellant meeting it with evidence of like kind. The doctrine of curative admissibility is applicable. Wigmore on Evidence (3rd Ed.), Vol. 1, sec. 15, page 304; Biener v. St. Louis Public Service Co., Mo.App., 160 S.W.2d 780. In our judgment, appellant was unfairly prejudiced by the action of the trial court in excluding appellant's Exhibit 2. The evidence should have been admitted.
But respondent says that the error, if any, was harmless since the X-ray films themselves were introduced in evidence and *866 appellant's witness, Dr. E. C. Funsch, interpreted said X-rays as showing the facts sought to be established by the X-ray reports.
We cannot agree that the testimony of Dr. Funsch rendered the error harmless. The evidence excluded goes to the very heart of plaintiff's case. It was evidence from a disinterested source and might very well have affected the outcome of the cause. As stated in Corpus Juris, Vol. 46, New Trial, sec. 75(b), page 115: "The exclusion of proper evidence is ground for a new trialprovided, however, that the ruling is prejudicialespecially where the excluded evidence goes to the very root of the matter in controversy, * * *. That there was other evidence of the same general character, or even that the rejected evidence was cumulative * * * may not render the error harmless." See, also, 66 C.J.S., New Trial, § 40.
Appellant assigns as error the giving of Instruction No. 7.
In Baker v. Kansas City Public Service Co., 353 Mo. 625, 183 S.W.2d 873, a substantially similar instruction was given. On appeal, an identical attack was made on said instruction as is urged here. The court held the instruction proper. We are bound by that authority.
Respondent filed in this court a motion to assess damages for vexatious appeal, under section 512.160 RSMo 1949, V.A.M.S. Said motion is overruled.
On account of the error in refusing to admit in evidence appellant's Exhibit 2, the judgment is reversed and the cause is remanded for new trial.
BENNICK, P. J., concurs.
RUDDY, J., absent when case was argued and submitted.
On Motion for Rehearing.
ANDERSON, Judge.
Respondent, in his motion for rehearing, contends that our holding in this case is in conflict with Buck v. Buck, 267 Mo. 644, 185 S.W. 208. In that case, appellant sought to introduce evidence which was not relevant to the issues on trial to rebut irrelevant evidence which was offered by the other party over appellant's objection. The trial court in said Buck case sustained respondent's objection to the alleged rebutting evidence, and the Supreme Court affirmed. The basis of the court's ruling was that the evidence offered was inadmissible, first, because it was irrelevant, and second, because appellant was adequately protected by his original objection to the inadmissible evidence offered by respondent.
In the case at bar, the evidence offered by appellant and excluded by the court was, in fact, logically relevant, and was offered to rebut evidence which went into the record without objection on the part of appellant. Appellant thus elected to protect itself, not by objecting to respondent's evidence on the ground that no proper foundation had been laid, but by using portions of the hospital record favorable to its cause which had been brought into court by respondent but not offered by him. Under the circumstances, we do not believe our holding is in conflict with Buck v. Buck, supra.
Nor do we believe our opinion to be in conflict with Shepard v. Shepard, Mo.App., 194 S.W.2d 319, and Longmire v. Diagraph-Bradley Stencil Machine Corporation, Mo.App., 176 S.W.2d 635. Both cases stand for the proposition that incompetent evidence offered on one issue will not justify the admission of incompetent evidence on an entirely different issue.
The rule that irrelevant, incompetent, or illegal evidence may be admitted to rebut evidence of like character is rightly limited to cases where the rebuttal is confined to the evidential fact to which the original evidence was directed. It does not permit the indiscriminate introduction of like evidence touching other issues. The permissible office of such evidence is merely to neutralize by direct contradiction the force and effect of the inadmissible evidence offered by the adverse party, and afford reciprocal rights to the parties in the use of evidence which the original party has in effect vouched for as being the kind of evidence properly to be considered.
*867 Nor is the rule confined merely to the introduction of immaterial evidence, as contended by respondent. It applies not only to the subject matter of evidence, but also to its nature. 22 C.J., Evidence, sec. 163, page 198; 31 C.J.S., Evidence, § 190, page 917; Harmon v. Stuyvesant Ins. Co., 170 Mo.App. 309, 156 S.W. 87.
Redman v. Peirsol, 39 Mo.App. 173, also relied on by respondent in his motion for rehearing, does not appear to be in conflict with our holding. Said case merely holds that because defendant was asked on cross-examination if he had received a letter from another he was not entitled to testify as to the contents of the letter.
While ordinarily the use of curative evidence of the character offered by appellant herein and excluded below rests within the sound discretion of the trial court, we see nothing in the record which justifies the exercise of that discretion against the admission of the evidence offered. On the contrary, it is our judgment that the facts show an abuse of discretion which has resulted in manifest injustice to the appellant.
Respondent's motion for rehearing is overruled.
BENNICK, P. J., concurs.
RUDDY, J., absent.