484 F.Supp. 1021 (1979)
Eugene WOLFF, Executor of the Estate of Marvin Deutsch, Deceased, on behalf of Geraldine Deutsch, Widow, Charles J. Deutsch, Richard K. Deutsch and Patricia K. Deutsch, Children, Plaintiff,
v.
WHITTAKER MARINE & MANUFACTURING CO., INC., a dissolved corporation, by Richard D. Whittaker, duly appointed Trustee, and Rockwell International Corporation, Defendants.
No. 77-629-A(3).
United States District Court, E. D. Missouri, E. D.
December 31, 1979.
*1022 Merle L. Silverstein, St. Louis, Mo., Rex Carr, East St. Louis, Ill., for plaintiff.
Robert R. Schwarz, Clayton, Mo., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits following a trial to the Court on plaintiff's allegations that defendant Whittaker Marine & Manufacturing *1023 Co., Inc. ("Whittaker") defectively designed and manufactured a houseboat leased by the decedent Marvin Deutsch, resulting in an explosion that injured and subsequently caused the death of the decedent. Eugene Wolff, as executor of the estate of Marvin Deutsch, seeks recovery on behalf of the decedent's wife and children on a theory of strict liability in tort.
Defendant Rockwell International Corporation assumed the liabilities of defendant Whittaker, a dissolved corporation, when it purchased Whittaker's stock. This purchase occurred at a time subsequent to the manufacture of the houseboat, the "Patty Kay", and prior to this action.
The Court has jurisdiction in admiralty over this matter pursuant to 28 U.S.C. § 1333(1), the incident in question having occurred at a marina on the Mississippi River, a navigable body of water. Actions arising out of the operation of pleasure craft on navigable waters fall within the admiralty jurisdiction of the federal courts. Richards v. Blake Builders Supply, Inc., 528 F.2d 745 (4th Cir. 1975); St. Hilaire Moye v. Henderson, 496 F.2d 973 (8th Cir.), cert. denied 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974). The decision of the United States Supreme Court in Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), created an action for wrongful death under general maritime law, independent of any statutory right.
The Court affirms its earlier ruling that this action is not barred by laches, although the explosion and decedent's death occurred in 1972 and this action was not filed until 1977. The Court has taken due consideration of the analogous two-year period of limitations prescribed by the Death on the High Seas Act, 46 U.S.C. § 761 et seq., see Public Administrator of the County of New York v. Angela Compania, etc., 592 F.2d 58 (2d Cir. 1979), in so ruling. The Court notes that what was essentially the same action as the instant suit was filed in St. Louis Circuit Court within two years of the events at issue here. Defendant had full opportunity to conduct discovery in the state court proceeding during the three year pendency of that suit and did conduct such discovery. Affidavit of Rex Carr, filed July 27, 1977.
The only claim of prejudice which the defendant has made is that the death of Mr. Merle Bell has deprived it of an eyewitness to the events just prior to the explosion. However, Kevin Bell testified at trial that Mr. Bell died in March, 1978, nine months after the complaint in this action was filed. Moreover, Mr. Bell had initiated his own action against the defendant some six months after the accident. Affidavit of Rex Carr. Therefore, because under the facts of this case, there has been no showing of prejudice to the defendant, the Court finds that plaintiff's delay does not constitute laches.
The houseboat at issue, the "Patty Kay", was manufactured in 1969 by defendant Whittaker. The "Patty Kay" was a 39 foot fiberglass houseboat equipped with twin 225-horsepower Chrysler gasoline engines and a Kohler 6.5 kw automatic start, 110 volt A.C. generator which produced electricity for the boat's appliances. These appliances included electric lights and an electric stove.
The two gasoline fuel tanks were located in the fuel compartment in the forward section of the boat, with one tank to port, and the other to starboard. The fuel compartment, part of the bilge, also contained the generator and water tank. The fuel tanks were connected by a common line to both engines, which were located 20 feet aft of the tanks. The fuel tanks were also connected by a common line to the gasoline-powered generator, which was located between the tanks. The two-foot section of rigid copper tubing that connected the port fuel tank to the fuel system had flared fittings at each end which connected with fittings in the fuel tank and in the main fuel line.
The fuel fill opening for the pipe leading into each tank was located in the floor of the catwalk which ran along both sides of the "Patty Kay". This opening had a plate *1024 which was caulked so that this inlet was fuel and water tight at the time of manufacture.
There was a free-flow ventilation system in the "Patty Kay", with intake and outlet vents for the fuel compartment located in the sides of the hull. There was also a blower system for purposes of ventilation, with one blower in the fuel compartment and a second in the engine compartment.
The "Patty Kay" was leased by the decedent on June 27, 1969, from the L & L Leasing Company, which had purchased the vessel that day from Lake Center, Inc. Lake Center, Inc. had purchased the "Patty Kay" from defendant Whittaker on June 23, 1969. The vessel remained in the decedent's possession from June 27, 1969, to May 7, 1972, the date of the explosion.
On May 7, 1972, at Lake Center Marina, which is located on the Mississippi River at St. Charles, Missouri, Marvin Deutsch and his son Charles boarded the "Patty Kay", which had not been moved since the end of the boating season in the fall of 1971. The blowers, one of which was located in the fuel compartment and the other in the engine compartment, were turned on. After waiting 10 minutes, the engines were started without difficulty and the boat was taken approximately 100 yards to the fueling dock, where it was tied up and both engines shut down. The decedent left the "Patty Kay" at some time after tying up to the dock.
At the fuel dock, Kevin Bell, a Lake Center Marina employee, handed Charles Deutsch the fuel line from the pump, and Deutsch filled the port and starboard tanks until some gasoline came out of the overflow vent holes. After fueling, Charles Deutsch testified, he used the hose located at the fuel dock to wash down the decks of the "Patty Kay", including the catwalk. A Coast Guard report prepared several months after the incident indicated that, during fueling, some spillage had occurred on deck which was then hosed off. Charles Deutsch testified at trial that he did not recall closing any doors or windows before fueling, and the evidence was that the proper safety procedure is to close the doors and windows before fueling.
Marvin Deutsch returned to the "Patty Kay", accompanied by Merle Bell, a Lake Center Marina employee who came aboard to assist in solving some mechanical problem. The nature of that mechanical problem was unknown to those testifying at trial, although the Coast Guard report indicated that one of the engines was balky. (Mr. Bell died in March 1978, prior to the commencement of trial, from causes unrelated to the explosion. His deposition had not been taken.)
Approximately thirty to sixty minutes after the "Patty Kay" was fueled, Merle Bell switched on a light in the cabin. Marvin Deutsch then turned on one of the burners on the stove. It was at that time that the "Patty Kay" exploded and then burned. Charles Deutsch, who was in the kitchenette with the decedent and Merle Bell, fell through the cabin floor into the bilge. All three men managed to escape from the burning boat, but not without receiving serious burns. Marvin Deutsch died from his injuries on May 22, 1972.
The evidence indicated, and the Court so finds, that the cause of the explosion was the ignition of gasoline vapors in the fuel compartment and bilge area. The most likely source of ignition for those fumes was the generator. The evidence was that, in general, the greater the demand for electricity, the greater the likelihood that the generator would spark, and the evidence was that the explosion occurred just after the stove and the lights had been turned on.
The plaintiff argues that the evidence adduced at trial established three specific defects in the design or manufacture of the "Patty Kay". The first, on which plaintiff's case concentrated most heavily, was that defendant created a stress riser at the end of the piece of copper tubing which was used as the fuel line from the port fuel tank to the main fuel line, causing a crack to develop through normal usage three years later. The second was that the nut on the connection of that same fuel line to the fitting on the port gas tank was insufficiently *1025 tightened at the time of manufacture, allowing the nut gradually to loosen to the point where the connection leaked. The third was that the placement of the generator in the fuel compartment was an inherently dangerous design in that explosive vapors were likely to gather there. The defendant maintains, inter alia, that the evidence shows that there had been repairs done on the boat in the three years that it was in the decedent's possession which altered the condition in which the boat left the defendant.
At trial, the plaintiff read into evidence the deposition of Jerry Schneider, who delivered the "Patty Kay" to the St. Charles Marina in 1969. Schneider testified about the design of the vessel. He indicated that the fuel line to the generator from the main fuel line was a rigid line as far as the base of the generator and that the remaining portion connecting with the generator was a flexible line. A similar flexible line connected to each of the engines. This was done to protect against vibration. The copper line leading from each fuel tank to the main gas line, however, was rigid. The main fuel line was supported every eighteen inches to protect it from vibration.
Mr. Schneider testified further that the Coast Guard had inspected the model boat for the "Patty Kay" and had approved of its manufacture and design. He indicated that explosion-proof generators were found only in Navy vessels. He identified a check-off list which was used to examine the boat before it was delivered. One of the items checked on the list was "Gas Tank and Fittings". He also indicated that if the Kohler generator choke were rebuilt, as plaintiff's exhibit 73 indicated it had been in April, 1971, it would have been necessary to disconnect "the main supply line, the flex line and all", and remove the carburetor.
Richard Townsend, a naval architect, testified for plaintiff that sometime in October, 1972, he inspected the beached remains of the "Patty Kay" at the request of an attorney. He traced the fuel system and discovered that there was a transverse crack around the copper tubing at the port fuel tank coupling, just at the end of the nut, and that this section of tubing was extensively bent. Townsend further testified that the crack was 1/64 inch wide and that it extended approximately half the way around the circumference of the tubing. He did not know whether the crack had occurred before or after the explosion. The flare fitting at the site of this crack, which Townsend called a good flare, but not a perfect one, was carboned over.
Townsend also testified that in less than an hour, assuming the cross feed valves were open because the engines had been turned on, 1½ pints of gasoline would have leaked out of the crack, and that, mixed with air in the right proportion, the gas would have had the explosive force of two sticks of dynamite.
Townsend removed the copper tubing from the port tank; he stated that he had no trouble removing the tubing because the nut that was part of the coupling at that site was only finger tight. He also indicated that he thought that the threads in the nut showed some wear, which would have occurred by being taken on and off.
Townsend further stated that he had no quarrel with the design of the "Patty Kay", although as of the time of trial the American Boat & Yacht Council ("ABYC") was trying to establish a standard for separation of engines from fuel compartments.
Dr. Leonard Gulbransen, a professor of metallurgy at Washington University, testified that the fittings were brought to him for his inspection in November or December of 1972. At this time the tubing was still in one piece, with a crack 3/8 inch from the flare on one end. The fracture surface was covered with carbon. Gulbransen cut the tubing apart at the fracture site, and below the fracture site, for the purposes of examination. (The small bit of tubing cut off at the fracture site, with its nut, was introduced as plaintiff's exhibit 26A; the remainder of the tubing, with the nut at the other end, was plaintiff's exhibit 26. They are hereinafter referred to as "26A" and "26", respectively.)
*1026 Gulbransen testified that because there was no plastic deformation at the fracture surface, it was his opinion that this was a brittle fracture. According to Gulbransen, this brittle fracture occurred around the circumference of the tubing, where there was an indentation caused by a tool of some sort, and rings around the tubing caused by vibrating stresses. Use of a flaring tool on tubing lessens its fatigue strength, he testified, but that some stress riser is inevitably created when a tube is gripped and indented in the process of creating a flare. He further indicated that it is ordinary and proper procedure to grip a tube in creating a flare. He had not tested 26 and 26A for the amount of reductions in fatigue or tensile strength that had occurred.
It was also Gulbransen's opinion that the crack in question was a fatigue failure not caused by an external explosion. The fracture occurred, in his view, before the fire because there were carbon deposits on the fracture site. A further reason for his opinion that the fracture occurred before the fire was the fact that the crack was a brittle fracture, whereas an explosion would cause a ductile fracture with resulting plastic deformation. Gulbransen stated on cross examination, however, that there would also be carbon deposits in the crack if the fracture had occurred simultaneously with an explosion followed by a fire.
On cross examination, Gulbransen further stated that in order to determine the proper fuel line to be used, it is necessary to calculate the stresses, flow to the engine, and load on the line. While he did not know how to calculate the load on this line, it appeared to him to be low, and that the copper tubing used was more than adequate. He also stated that any handling of a fitting may cause subsequent leakage.
Alan Siegel, the director of Industrial Testing Laboratories whose degree was in Chemical Engineering, testified that upon viewing the tubing in question in February, 1978, the crack appeared to be a brittle fracture, related to fatiguing from work hardening. The notch on the tubing, which the fracture followed, appeared to be caused by some sort of clamping device; while the notch had no effect on the strength of the tubing, it did set up stresses, which are progressive. The work hardening was caused by cyclic stress, and vibration is one form of such stress. Siegel made only a microscopic examination of the tubing; he made no physical test upon it to determine its fatigue or tensile strength.
Siegel testified on cross examination that he thought that there was no excessive flaring on 26 or 26A and that the flares sat well within their fittings. Siegel further stated that there was a difference in the threads of the nut of 26A in that they were shinier, towards the bell end, than those in the nut at the other end.
It was the deposition testimony of Harry Coll, a graduate engineer, who had designed pleasure boats for the Chris Craft Company, that the type fitting and flaring used on 26 and 26A were in conformity with safety standards. Coll stated that the flare on 26A was a good flare in that it was evenly made. Additionally, Coll stated that the crack in the tubing had not been caused by a defective flare, because such a crack would run longitudinally in the tubing, and not around the circumference as it did in 26A. Coll ultimately concluded that the smooth-surfaced section of the broken end of 26A seemed to be a fatigue fracture.
Coll further indicated that tubing can be stressed when it is attached to the fuel line, when a flare is made, or when the connector is tightened into the shut off valve or tank. He also stated that non-defective tubing could be cracked through inept repairs or removal. Further testifying, he said that there was an "imperceptible" movement of the fuel tank in relation to the fuel line, which the vessel was designed to accommodate.
Mr. Coll testified that he had participated in the formulation of the ABYC standards, and that there were no ABYC standards that prohibited the placement of the generator between the gas tanks and no standard that required the insulation of the generator or the engines from the gas tanks. He stated that there was no such thing as a *1027 spark-proof generator and that the generator on the "Patty Kay" conformed to the ABYC and National Fire Protection Association ("NFPA") standards. Further, he stated that the ventilation system on the "Patty Kay" moved more air than was required by the ABYC.
John Senne, a specialist in accident reconstruction with a master's degree in engineering, testified for defendant that the use of this copper tubing and the flaring were appropriate for the type fuel line on the "Patty Kay". He stated that the flares on 26A and 26 were excellently made, and that the clamp markings on the tubing that were made by the flaring tool were harmless and did not affect the structure of the pipe. Senne further stated that if the flare were to split the tubing, it would cause a longitudinal split.
Senne testified that it would not be possible to use the wrong sized flaring tool and make an even flare. A tool that was too large would not grip the tubing, and one that was too small would crush it.
Senne explained that cyclic stresses could cause fatigue failure in the copper tubing. He notes that there were stress risers present from the grooves of a clamp, that there was a notch in the tubing, and that the hull was subject to some vibrations, even though the use of flex lines and shock-mounted engines reduced the effect of such vibrations. Senne testified that such vibrations could cause work hardening, which would result in a brittle, rather than a ductile fracture when the tubing was subjected to some unusual force. It was his opinion that the unusual force here was the explosion, which caused the tubing to bend and then crack in a brittle fashion. He did admit, however, on cross examination, that the fracture could have occurred prior to the explosion.
Senne remarked that there was a difference in the quality of threads inside the nuts of 26 and 26A in that the threads on the nut of 26 were darker and the threads on the nut of 26A were worn. The significance of this, according to Senne, was that it was likely that the nut of 26A was taken on and off several times. He also noted that if the couplings were only finger tight, there would probably have been a leak. He indicated that if the fittings were only finger tight at the factory, they would have loosened more, and they would have created problems in the fuel system.
As noted initially, plaintiff has proceeded in this action on a theory of strict liability in tort. This doctrine was incorporated into the general maritime law in this Circuit in Lindsay v. McDonnell Douglas Aircraft Corporation, 460 F.2d 631 (8th Cir. 1972), on remand, 352 F.Supp. 633 (E.D.Mo. 1972), aff'd 485 F.2d 1288 (8th Cir. 1973). Under the Restatement (Second) of Torts § 402-A, adopted in Lindsay,
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
A strict liability plaintiff may establish the existence of a defect through circumstantial evidence, and the plaintiff need not establish any specific defect. Lindsay, supra; Higginbotham v. Mobil Oil Corp., 545 F.2d 422 (5th Cir. 1977), rev'd on other grounds 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). The fact that a product malfunctions at all is some proof of a defect. Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969). However, a plaintiff seeking to establish through circumstantial evidence that some defect existed in a product must do two things: he *1028 must negate causes other than a defect in the product, and he must show that whatever defect might have been in the product was introduced by the defendant. Stewart v. Ford Motor Company, 553 F.2d 130, 137 (D.C.Cir.1977).
The courts have been duly cognizant of the difficult problems of proof facing strict liability plaintiffs, and have not required such a degree of proof that the cause of action is effectively extinguished.
The plaintiff is not required to eliminate all other possibilities, and so prove his case beyond a reasonable doubt. As on other issues in civil actions, it is enough that he makes out a preponderance of probability.
* * * * * *
[L]apse of time and long continued use . . . in itself will never prevent recovery where there is satisfactory proof of an original defect; but when there is no such definite evidence, and it is only a matter of inference from the fact that something broke or gave way, the continued use usually prevents the inference that more probably than not the product was defective when sold.
W. Prosser, The Law of Torts, § 103 at 673-74 (4th ed. 1971).
In the instant action, the plaintiff has not relied on a general inference of defect but has attempted to prove several specific defects. However, the plaintiff is not necessarily foreclosed from reliance on a general theory simply because he has attempted to prove specific defects. Stewart, supra. The Court finds, however, that the plaintiff did not sufficiently sustain his burden along either avenue of proof.
As to the fracture that was found between 26 and 26A, the Court finds that although it is possible that the fracture pre-existed the explosion, it is just as possible that it was caused by the explosion. The presence of carbon is not dispositive, since the testimony was that there would have been carbon in the fracture had it occurred simultaneously with the explosion. Moreover, although there was also agreement that it was a fatigue fracture, there was testimony that if the material had "work-hardened" to a sufficient degree, the explosion itself could have caused a fatigue fracture.
Moreover, there was no evidence that the flare on 26A was improperly made. The type of notch which appeared on the tubing would have inevitably been created had the tubing been gripped while being flared. Dr. Gulbransen indicated that it was the ordinary and proper procedure to grip tubing while flaring it, and Mr. Seigel testified that the notch did not affect the strength of the tubing. None of plaintiff's experts had performed any physical tests on 26 or 26A to determine what reduction, if any, in the fatigue strength of the tubing had occurred beyond that which would be expected as a result of flaring. There was no indication that the "notch" or marking was in any way excessive. The Court finds that, considering all the evidence, the plaintiff has not established by a preponderance of the evidence that the fracture occurred prior to the explosion or, therefore, that the fracture was a result of a manufacturing defect.
As to the second alleged defect, that the fitting on 26A was insufficiently tightened as of the time of manufacture, the Court finds that this is not likely in view of the testimony of Mr. Senne, that a fitting which started only finger-tight would have become even looser. The Court does not find that it is the reasonable inference from the evidence that the nut would have gradually loosened over a three-year period to the point where it leaked.
Moreover, there was some evidence that the threads on the nut on 26A were more worn than those on 26. This would indicate that the nut was taken on and off several times. It is more probable that the nut was insufficiently re-tightened at some point after manufacture than at the time of manufacture.
Thirdly, the Court finds that the evidence does not support the allegation that the boat's design was unreasonably dangerous in any respect. The evidence was that the *1029 boat complied with the standards of the ABYC and the NFPA. The NFPA standard 632 and the ABYC standards in fact implicitly recognized that boats are designed such that electrical equipment is located where flammable vapors are present; the evidence was that the "Patty Kay" met the standards as to the prevention of ignition of those fumes as well as the state of the art in the pleasure craft industry allowed. Again, the testimony of Mr. Coll was that the "Patty Kay" complied, from a practical point of view, with the ABYC recommendation that a generator be placed "as high above the bilges as practicable" or "as possible". The Court does not find that the "Patty Kay's" conformity to the actual practices of the pleasure craft industry rendered it "unreasonably dangerous".
Finally, the Court notes that the evidence did not support any of the other allegations of defective design and manufacture set forth in plaintiff's complaint. The evidence was that the ventilation system was more than adequate, that vapor tight compartments and spark-proof generators existed only on Navy vessels, and that the fuel lines were adequately designed to withstand vibrations. There was no evidence that the placement of the electric range in relation to the gas tanks was unreasonably dangerous or that the electrical system was defective.
In sum, the Court concludes that the plaintiff has not established any specific defect in the design or manufacture of the "Patty Kay", nor does the Court draw a general inference that the vessel was defective. Plaintiff introduced no evidence that the boat had malfunctioned from the time it was leased by decedent. In fact the evidence was that the decedent had used the boat three or four times per week in each boating season since 1969, apparently without incident. The Court finds that the evidence does not preponderate that a defect of design or manufacture caused the explosion which claimed the decedent's life. The plaintiff has not sufficiently negated other possible causes for the presence of gasoline vapors: negligent fueling procedures and tampering with the fuel lines and with the fitting on 26A.
Accordingly, judgment will be entered for the defendants in this action.
The Court enters the foregoing Memorandum as its findings of fact and conclusions of law in compliance with Fed.R.Civ.P. 52.