Roy Dean JOHNSON and Bette Johnson, Plaintiffs–Appellants,

v.

HYSTER COMPANY, Defendant–Respondent,

and

G. Spencer Miller, Personal Representative for the Estate of Douglas Fletcher, Deceased, Defendant–Appellant/Respondent.

No. WD 41357.

Missouri Court of Appeals, Western District.

Sept. 5, 1989.

J. Kirk Rahm, Rahm and Rahm, Sedalia, for plaintiffs-appellants.

Joseph A. Sherman and Mark E. Harris, Kansas City, Sherman, Wickens, Lysaught & Speck, for defendant-respondent.

G. Spencer Miller, Miller, Dougherty & Modin, Kansas City, for defendant-appellant/respondent.

Before SHANGLER, P.J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Roy Dean Johnson filed suit for personal injury against the Hyster Company and Douglas Fletcher.[1] A claim by Johnson's wife, Bette, for her loss of consortium was joined with this suit. The jury returned a verdict in favor of Johnson for $100,000 and assessed percentages of fault against Hyster, Miller, and Johnson.[2] The jury returned a verdict in favor of Bette for $10,000 and assessed percentages of fault against the same parties but in different percentages from that on the verdict in favor of Johnson.[3] The court stated the verdicts were inconsistent, gave the jury new verdict forms, and sent them out to deliberate further. The jury returned with a verdict in favor of Johnson for $300,000, with the same percentages of fault as in the first verdict, and a verdict in favor of Bette for $30,000, with the same percentages as in Johnson's verdict. The court entered judgment on the second verdicts.

On motion of Hyster the court granted a new trial on all issues based on eleven non-discretionary grounds.[4]

The Johnsons and Miller have appealed, contending that the court gave the correct instructions, and that there were no other trial errors requiring a new trial. Reversed and remanded.

On October 8, 1983, Johnson was working with an asphalt crew employed by Superior Asphalt. Johnson was working as a screed operator on the left rear of an asphalt paver, operating controls to assure that the asphalt was laid with the proper thickness. Fletcher was operating a roller manufactured and sold by Hyster.[5] The roller had two large steel wheels and weighed between ten and fourteen tons. The roller operated behind the paver by

1. After suit was filed, Douglas Fletcher died and on suggestion of death being filed, G. Spencer Miller, the personal representative of the Estate of Fletcher, was substituted.

2. Hyster 60%, Miller 10%, Johnson 30%.

3. Hyster 40%, Miller 0%, Johnson 60%.

4. The eleven grounds lend themselves to consideration by category as discussed herein.

5. The Workers Compensation Act does not bar suits between fellow employees for negligence. *Lamar v. Ford Motor Co.*, 409 S.W.2d 100, 107[6] (Mo.1966).

rolling over the freshly laid asphalt. The roller was equipped with a diesel engine and a hydrostatic transmission (which meant that when the roller was standing still the engine would remain in neutral). The roller was operated by means of a control bail, which is a black bar, attached at both ends of the control panel in front of the operator. The bar runs horizontally across, and extends upward from, each end of the control panel. To move the roller forward the operator pushes the bar upward and to move backward he pushes down. When the bar is in the center position the engine is in neutral.

Attached to the control panel is a metal plate with a notch which can be extended toward the bar so that the bar fits into the notch when the bar is in the neutral position. This effectively prevents the bar from being moved until the plate is retracted. The roller was also equipped with a hand brake.

On the day of the accident, the roller was standing, with the bar in neutral, between eight and fifteen feet behind the paver, and the crew was idle, awaiting the arrival of a truckload of asphalt. The procedure was for a truck to dump a load of asphalt into the paver, the paver would proceed to lay the asphalt, and the roller would follow.

One of the items of equipment used by one of the screed operators was a twelve to fourteen foot long, one inch thick and two inch wide wooden grade check pole. There was evidence that Ray Wortherly was the screed operator working on the other side of the paver from Johnson. When work ceased, to await the arrival of the truck, there was evidence that Wortherly placed his grade check pole on the roller.

When the truck with asphalt arrived, the men began to assume their work positions. There was evidence from which the jury could have found that Fletcher removed the grade check pole from the roller, in the process struck the bar which caused the bar to move upward, and resulted in the roller moving forward. Johnson's son, Dan, was working as a raker near the roller, and he noticed the roller begin to move forward. He shouted to his father,

because at that time Johnson had just stepped up on to the paver so that he was directly in front of the roller. Fletcher tried to get on the roller to stop it but was unsuccessful. Johnson saw the roller approaching and decided to try to get out of the way by crossing along the back of the paver to get off on the opposite side. There was evidence that he could have simply stepped backward and off the paver and out of harm's way. Instead, Johnson stepped forward and did not make it across the back of the paver and was struck in the leg by the roller.

There is no issue presented concerning the injuries Johnson suffered. It will suffice to say that his injuries were severe.

The case was submitted to the jury against Hyster on a theory of product liability, based on a failure to equip the roller with a device which would prevent the roller from moving unless the operator was sitting in his seat. It was also contended that the roller should have been equipped with a device which would emit a warning signal any time the roller was moving.

There was evidence that if Fletcher had extended the metal plate to hold the bar in neutral, or if he had shut off the engine, or if he had engaged the hand brake the accident would not have happened. There was evidence that operators of the roller did not shut off the engine when the roller was stopped because of the difficulty in starting a diesel engine and for fear of wearing out the starter which was an expensive piece of equipment. There was also evidence that operators habitually failed to utilize the plate to hold the bar in the neutral position. There was evidence the hand brake was not utilized, and even so, there was evidence it would have been impossible for the hand brake to have prevented the roller from moving.

The case was submitted on negligence against Hyster for failure to warn Fletcher that the roller would move even if the operator was not seated at the controls. The submission on negligence against Miller (Fletcher) was based on failure to set the brake, turn off the engine, or move the

metal plate to prevent the bar from moving.

Hyster objected numerous times during the trial to the participation of Miller. Hyster contended that Miller was engaged in a sham because Miller had obtained his appointment as personal representative of the Estate of Fletcher at the request of Kirk Rahm who represented Johnson. Hyster contended that Miller tried the case as a plaintiff, rather than a defendant, and sought to either bar his participation or limit his ability to cross-examine witnesses. The court granted a new trial on the ground that it had erred in failing to limit Miller's participation. Miller and Johnson contend that Miller's representation was proper.

Before the trial, Rahm and Miller informed the court that Miller had requested appointment as personal representative of the Estate of Fletcher at the request of Rahm because of his long standing friendship with Rahm. Both Miller and Rahm denied that they had any agreement concerning the conduct of the trial. Both stated that Miller was acting without any promise of payment from Rahm and that Miller had no prospect of payment from the estate because the estate contained no assets and there was no insurance policy covering Fletcher.

Hyster points to various trial incidents, such as Miller telling the jury panel during voir dire that Johnson suffered severe injuries, and draws from this the conclusion that Miller was engaging in a sham. Allegedly Miller's real purpose was to aid Rahm in obtaining a verdict for Johnson, with all of the blame cast on Hyster.

■ A review of the transcript fails to disclose any evidence of agreement between Rahm and Miller concerning the conduct of the trial or any payment to Miller. The record does indicate that Miller vigorously defended the Fletcher estate in every manner permitted by law. The conduct of Miller in the trial involved only a matter of trial tactics which was within the sole discretion of Miller. *Mavrakos v. Mavrakos*

*Candy Co.*, 359 Mo. 649, 223 S.W.2d 383, 388[15–17] (1949). Miller properly tried to show that the accident was the entire responsibility of Hyster which was to the advantage of his client. There was certainly nothing improper in that conduct.

■ The trial court granted a new trial on the ground of error in giving instructions which submitted theories of recovery against Hyster both on product liability and negligent failure to warn of the fact the roller could move without the intervention of the operator. The court held that the theory of product defect and negligent failure to warn were inconsistent and, therefore, improperly submitted. The test of inconsistency in theories of recovery was stated in *Davis v. Hauschild*, 243 S.W.2d 956, 960[6] (Mo.1951), to be that one theory must allege what the other denies or that the theory of one must be repugnant to the other. By this test there is no inconsistency between product defect and negligent failure to warn. In fact, the negligence theory depends upon the product defect in this case, because the negligence is alleged to be the failure to warn of the fact the roller could move without the operator being present to control its movement. This did not repudiate or disprove the product defect which was alleged to be the manufacture of the roller without a device to prevent the roller from moving when the operator was not seated at the controls.[6]

■ The court also granted a new trial on the ground that there was error in the instructions submitting the claim of product liability and negligent failure to warn. The instructions followed the illustration in MAI 35.15. Hyster contends that these are 1988 forms which do not apply to this 1983 accident. The change between 1983 and 1988 in product liability litigation was the decision in *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491 (Mo. banc 1986), and the passage of § 537.765, RSMo 1987 Supp. *Lippard* held that comparative fault was not applicable to a product liability case but § 537.765 permits the assess-

---

6. It is interesting to note that MAI 35.15 (3rd Ed.1989, pocket part) gives an example of a

submission on product liability and negligent failure to warn on the part of the manufacturer.

ment of comparative fault in a product liability case for causes of action which accrued on or after July 1, 1987. Here the instruction did not submit product liability under comparative fault, but only allowed comparative fault to be assessed on the negligence claim. That was the proper procedure for a cause of action which accrued in 1983. The instructions submitting Johnson's claim were in accordance with the committee comment to MAI 35.15 illustration and no error appears.

■ Hyster contends, and the court found, that the instructions were improper because the jury was allowed to award damages based on both product defect and negligent failure to warn without requiring the jury to make a separate assessment of damages on each theory. Hyster contends that this allowed the jury to increase the damages by finding against Hyster on two separate theories but with only a single verdict. This contention was answered in *Rinker v. Ford Motor Co.*, 567 S.W.2d 655, 667[16] (Mo.App.1978). In that case this court pointed out that the damage instruction directed the jury to award damages for the "occurrence mentioned in the evidence" and there was but a single occurrence which resulted in damage. For that reason, this court held it was not necessary to require the jury to assess damages on each theory of recovery. That is the situation in this case. Here, the jury was instructed to assess damages for the occurrence mentioned in evidence. There was but a single occurrence which resulted in Johnson's injury. As stated in *Rinker*, there is no reason to assume that the jury disregarded the instruction.

■ The court also granted a new trial for error in the loss of consortium verdict. The form of verdict for Bette's claim contains spaces for the jury to assess the percentages of fault on the part of Hyster, Miller, and Johnson on the negligence claim. There is no general MAI form of verdict which submits a loss of consortium claim, however, the claim of Bette is derivative from the claim of Johnson, and for

that reason the percentages of fault assessed in the claim of Johnson are the percentages which must be applied to the claim of Bette. *Finninger v. Johnson*, 692 S.W.2d 390, 394[13] (Mo.App.1985). The court erred when it gave an instruction which allowed the jury to find percentages of fault in the verdict form on Bette's claim, because this allowed the jury to assess different percentages on the two claims. Since the same percentages assessed in Johnson's claim must be applied to Bette's claim, it was error to allow the jury to assess percentages in Bette's claim.[7]

Hyster contends that even though the jury found different percentages on Bette's claim, the intent of the jury was clearly expressed in the first verdicts returned, and the court should have received those verdicts and entered judgment on them. Hyster states that for this reason the court should not have granted a new trial.

■ In *Hinton v. State Farm Mutual Automobile Ins. Co.*, 741 S.W.2d 696 (Mo. App.1987), this court held that a verdict which contained an award of actual and punitive damages clearly expressed the intent of the jury, even though it contained language that part of the punitive damage award was to go to the plaintiff, part to a national organization, and that the defendant was to pay all legal fees. This court held that the statements by the jury concerning part of the award going to a national organization and the payment of legal fees was surplusage, which should have been disregarded by the court and the verdict should have been received. Instead, the trial court found the verdict improper and sent the jury back to deliberate further. This court held the trial court should have received the first verdict, reversed the judgment, and remanded with directions to enter judgment on the first verdict.

■ The same situation is presented here. The jury first returned a verdict in favor of Bette with percentages different from the percentages of fault listed in the

---

**7.** The jury failed to write the name of either Bette or Hyster on the verdict form in the place designated for a finding on loss of consortium for product liability. However, the jury had found for Johnson on this claim, thus the jury necessarily had to find liability on this ground in Bette's claim. *Pietrowski v. Mykins*, 498 S.W.2d 572, 580[9] (Mo.App.1973).

verdict on Johnson's claim. The court noticed the difference and advised counsel that the jury had returned inconsistent verdicts. The court thereupon obtained an agreement from all counsel that the jury would be told to return to its deliberations with new verdict forms for both Johnson and Bette. The first verdict had awarded Johnson $100,000 and Bette $10,000. After the court gave the jury new verdict forms the jury deliberated further and returned with new verdicts in which the percentages of fault were listed the same as in the first verdict on Johnson's claim but the award to Johnson was $300,000. The verdict form for Bette assessed the same percentages of fault as on the Johnson claim and awarded her $30,000. The court entered judgment on the second verdicts.

Because the claim of Bette is derivative, and the percentages of fault assessed on her claim must be the same as the percentages assessed on her husband's claim, the court should have simply held the percentages listed in the first verdict form on Bette's claim to be surplusage. The first verdict clearly expressed the intention of the jury to award Johnson $100,000 and Bette $10,000. Thus, the court should have disregarded the surplusage in Bette's verdict form and accepted the first verdicts and entered judgment thereon.[8]

As a matter of law, the court should have entered judgment on the first verdicts, because they clearly expressed the jury's intent. The agreement of counsel that the jury should deliberate further and return new verdicts could not affect the course which the trial court should have followed when the first verdicts were received.

The jury awarded Johnson $100,000 and Bette $10,000 on finding against Hyster on both product liability and negligence, and against Miller on negligence. Under *Lippard* there can be no reduction in the verdicts for Johnson's contributory fault on the product liability recovery. Thus, the Johnsons are each entitled to the greatest amount recoverable under any single theory of liability. *Grogan v. Garner*, 806 F.2d 829, 839[18, 19] (8th Cir.1986). The largest recovery is on the product liability theory to which Miller was not a party, because recovery on the negligence theory would require a reduction of 30% for Johnson's contributory fault. Therefore, the court should have entered judgment on the first verdicts against Hyster only without any reduction for the percentage of fault found against Johnson on the negligence claim.

The judgment is reversed and this cause is remanded with directions to enter judgment on the first verdicts in favor of Roy Dean Johnson in the amount of $100,000 and in favor of Bette Johnson in the amount of $10,000 against Hyster. Costs on this appeal are divided equally between the Johnsons and Hyster.

All concur.

---

**8.** In any event, there was nothing wrong with the first verdict returned in favor of Johnson and no question was raised about it. Even if there had been a problem with Bette's verdict form, which there was not, the remedy was to send the jury back to put only Bette's verdict in proper form. *Rodgers v. City of St. Louis,* 688 S.W.2d 42, 44[7] (Mo.App.1985). There was no reason to have the jury further consider Johnson's claim.