Heather Day RICHCREEK
et al., Appellants,

v.

GENERAL MOTORS CORPORATION,
et al., Respondents.

No. WD 49371.

Missouri Court of Appeals,
Western District.

Aug. 29, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 3, 1995.

Application to Transfer Denied
Nov. 21, 1995.

John E. McKay, David C. Byerley, Kansas City, Evan A. Burkholder, McGuire, Woods, Battle & Boothe, Richmond, Va., for appellants.

James R. Jarrow, Stacy L. Cook, Baker Sterchi & Cowden, LLC, Kansas City, for respondents.

Before ULRICH, P.J., and
LOWENSTEIN and ELLIS, JJ.

LOWENSTEIN, Judge.

Seventeen-year-old Heather Richcreek (Richcreek) was rendered a quadriplegic when the 1985 Corvette in which she was riding was struck by a truck whose driver was attempting to elude the police. Richcreek and another passenger allegedly were

in the passenger bucket seat, although the parties disputed Richcreek's exact position. Richcreek's case was centered in common law negligence and strict product liability against the defendant, General Motors (GM), the manufacturer of the Corvette, for a defectively designed and/or defectively manufactured passenger seat hinge pin. The pin, according to the petition, came loose and popped out of place during the accident, allowing Richcreek's side of the passenger seat-back to fall backwards, where it could not keep her upright in the passenger compartment.

Richcreek appeals from a jury verdict for GM [1]. Although the jury awarded her damages in the amount of $10,000,000, and $203,876 to her mother, it assessed percentages of fault as follows: Plaintiff-appellant Heather Richcreek 20%; Defendant Edward Rouse, Jr. (the driver of the truck which struck the car in which Richcreek was a passenger) 80%; Defendant-respondent General Motors Corporation, the manufacturer of the car 0%.

The main thrust of plaintiff's many points on appeal is that the trial court erred in striking or excluding various forms of evidence (such as the car manufacturer's prior knowledge of safety problems and subsequent design changes to the seat hinge pin) that were advanced by the plaintiff to show a design defect of the seat hinge pin. Richcreek also sought punitive damages [2] alleging GM knew for five years that Corvettes from 1983 to the last half of 1985 had seat hinges which would fall apart unless the design was changed by using a longer pin, or actually welding the pin in place. GM approved specifications for the hinge pins, and the seat was manufactured by Lear, while the Corvette was sold by GM.

### THE FACTS

Richcreek was injured on September 1, 1990, when a full-size Ford pick-up truck driven by Rouse collided with a 1985 Chevrolet Corvette driven by Tony Scott. Rouse was eluding the police when he intentionally disregarded a stop sign and collided with the Corvette on its driver side at a 78 degree angle, causing it to spin off the road and into a fire hydrant. Both the Corvette and the pickup were traveling at approximately 33 mph.

The Corvette is a compact sports car equipped with two bucket seats, each designed for only one person (a driver and a passenger). At the time of the accident, however, the Corvette contained three people: driver Tony Scott, Heather Richcreek, and passenger Elizabeth Ormsby.

Scott was killed in the accident. Ormsby, who was sitting in the passenger seat of the Corvette next to the window, suffered only minor injuries. Richcreek, whose seating position at the time of the accident was disputed,[3] was severely injured and was rendered a

---

1. The other original defendant in this case, Rouse, has neither money nor insurance coverage, and has not appealed the judgment against him. Richcreek settled out of court with the following: Lear Seating Corporation (the actual manufacturer of the seat installed in the Corvette); the Board of Police Commissioners of Kansas City, Missouri; and the estate of Tony Scott (the deceased driver of the Corvette).

2. The trial court did not submit the count for punitive damages.

3. Jay Johnson, a witness of the accident, testified that Richcreek was not seated in the passenger seat at the moment of impact. Rather, he testified that he saw Richcreek behind the two front seats in the cargo deck area, leaning on her left side.

Ken Carter, an emergency medical technician at the accident scene, testified that while he was treating Richcreek she told him that she had been riding in the area behind the two front seats prior to impact.

Ormsby, the taller of the two passengers (6' 1", 150–155 pounds), testified that she was sitting in the passenger seat and Richcreek was sitting with half of her body on Ormsby and the other half of her body on the center console in between the seats.

Heather Richcreek (5' 8.5", 120 pounds) testified that she was sharing the passenger seat with Ormsby at the time of the collision, with Richcreek seated on the left part of the passenger seat (the "inboard" side) and with Ormsby on the right part of the passenger seat (the "outboard" side). She testified that her hips were in the seat and that her back was up against the seat-back.

Richcreek's experts testified there were "strike marks" inside the Corvette which were consistent with Richcreek's injuries, and also that these "strike marks" were in places consistent with Richcreek's having been seated in the front seat. GM's experts testified that the strike marks in the Corvette, and Richcreek's injuries, were not con-

quadriplegic, due in part to the failure of a seat hinge pin.

The hinge pin in question is a safety component of the Corvette seat which is supposed to hold the occupant of the seat in the front passenger compartment. One of Richcreek's claims was that the seat hinge pin was not properly attached to the assembly by the "staking" method. This was in her claims for negligence and strict liability. "Staking" is accomplished by striking the end of the hinge pin with a 60 ton press. The impact from the press causes the end of the hinge pin to spew out in a 360 degree circle, creating a lip or rim of metal to hold the hinge pin to the seat back and bottom.

Experts for both sides also examined the particular seat hinge pin at issue in the accident and testified with regard to the condition and effect of the seat hinge pin after the impact. Richcreek's expert testified that the seat hinge pin was not "staked" (attached) properly. He further testified that the seat hinge pin was merely "kissed" instead of being fully "staked", and that this defective staking of the seat hinge pin allowed the passenger seat that Richcreek was seated in to open up and twist after the impact of the Corvette with the fire hydrant, thereby allowing Richcreek's body to eject into the rear of the car. Experts for GM testified that the physical evidence showed that the seat hinge pin was staked properly, and that the seat hinge pin did not pop out or fail during or after the Corvette's impact with the pickup truck. They testified further that even assuming that the seat hinge pin was not staked properly, and even assuming Richcreek was sharing the passenger seat, the seat hinge pin still did not have anything to do with Richcreek's spinal injury because the seat-back could not move backwards enough to allow Richcreek to be ejected into the back of the Corvette because the passenger seat of the Corvette is in such a tight "cockpit" area, much like a jet fighter plane.

Richcreek also sought recovery under strict product liability for a design defect of the hinge pin. Richcreek claimed that GM's specifications for the seat hinge pin were defective because the three-millimeter-long hinge pin was not long enough to allow proper staking, and that the only way the "too short" pin could have been made safe was by welding the pin in place.

### RICHCREEK'S THEORY

Richcreek's theory at trial was that she and Ormsby were sharing the passenger seat of the Corvette at the time of the accident (with Richcreek on the left part of the passenger seat next to the console which separated the driver and passenger seats, and Ormsby on the right part of the passenger seat next to the window). Upon impact with the pick-up truck, the passengers of the Corvette were forced toward the front-left side of the Corvette. Upon the next impact with the fire hydrant, Richcreek was ejected into the back part of the Corvette because the passenger seat hinge pin on the "inboard" left side where she was sitting popped out of place and failed to keep her in place. Richcreek struck her head near the rear of the car, receiving paralyzing injuries. Her pleading was for negligent manufacturing and design and for a strict products liability under manufacturing and design defects against GM. Her count against Lear was for a strict products liability cause for a manufacturing defect.

### GM'S THEORY

GM's theory at trial was that Richcreek was not seated in, or even sharing, the passenger seat, but rather that she was seated in the back of the Corvette in the "booty" or cargo area. GM also disputed Richcreek's contention that the passenger seat's "inboard" hinge pin popped out at impact and failed. GM also contends that since Richcreek was seated in the back area of the Corvette, her injuries could not possibly have been caused by the passenger seat hinge pin, regardless of whether it was defective or not, since the pin is designed to keep the passenger in the front of the Corvette and Richcreek was already positioned in the back of the Corvette at the time of the accident. GM's final defense was that the raised cargo

---

sistent with Richcreek's being seated in the front passenger seat. On the contrary, GM's experts testified that the physical evidence was consistent

with Richcreek's riding in the area behind the two front seats at impact.

area came to within two inches of the seat-back, so it could not have fallen backwards significantly.

### OVERVIEW OF THE POINTS ON APPEAL—THE EVIDENTIARY RULINGS:

Richcreek's points on appeal are based on certain evidentiary rulings made by the trial court. The trial court initially allowed certain testimony and documents in evidence, then later ordered them stricken. Still other evidence was excluded when offered.

■ The evidentiary rulings at issue came after testimony by a Richcreek expert that the seat's hinge pin was improperly manufactured because it was not staked according to GM's design specifications. Therefore, the trial court reasoned, Richcreek's own evidence went to prove injury by defective *manufacturing*, not improper *design*. Accordingly, the trial court reasoned that any evidence of subsequent *design* change to the hinge pin was irrelevant.

It was ruled plaintiff's prior evidence of design should be stricken. This ruling was not made known to the jury. No withdrawal instruction was given. Richcreek was not allowed to refer to this evidence (to be outlined later under the caption STRICKEN) to the jury in closing. Other evidence as to design of the seat and the hinge pin, such as corrections prior to the accident and safety measures, lengthening of the pin and welding, was never introduced.

### CORRECTNESS OF THE EFFECT ON THE OUTCOME:

The case of Richcreek against GM has taken a confusing course both at trial and here. The difference between a theory of design and manufacturing defect under strict liability is not clear at all times, and in all factual alignments. It must also be remembered that this is not an appeal on the jury's ability to apportion fault to GM under the verdict directors or the instructions. Following her petition, the court submitted Richcreek's tendered instructions—MAI 25.04 for strict liability for design defect, and MAI 25.09 for negligent design, and both modified MAI 37.01 to allow for comparative fault. The law applicable here, as well as the par-ticular facts here, have led to the present evidentiary question.

In a nutshell, the plaintiff went against GM on strict liability in tort for design and manufacturing defect, and for common law negligence. This case boils down to whether, in this context, the evidentiary rulings were correct and, if not, their prejudicial effect.

\* \* \*

A brief background of the pertinent law of manufacturing and design strict liability and negligence is in order.

A manufacturer is liable under strict liability—product defect if the product was in an *unreasonably dangerous defective condition* when *put to a reasonably anticipated use*, and the *plaintiff was damaged as a direct result* of such defective condition *as existed when the product was sold*. § 537.760, RSMo 1994. The Missouri Supreme Court first adopted strict tort liability in *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362 (Mo.1969). *Keener* was a case involving a defect in the *manufacturing process* of a product. *Id.* at 364. The court adopted the rule of strict liability set out in *Restatement (Second) of Torts* § 402A. *Id.* (Emphasis added).

*Stinson v. E.I. Dupont De Nemours & Co.*, Mo.App. W.D., 904 S.W.2d 428 (1995).

The Court extended strict liability to *design* defects in *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977) saying:

In *Keener*, this court established that an action sounding in strict liability in tort may lie to recover for injuries caused by a product which is unreasonably dangerous as manufactured. It is only logical that in this case we permit an action in strict tort liability to obtain for the recovery for injuries caused by a product which is unreasonably dangerous as designed because,

"[T]here is no rational distinction between design and manufacture in this context, since a product may be equally defective and dangerous if its design subjects protected persons to unreasonable risks as if its manufacture does so." *Pike v. Frank G. Hough Co.*, 2 Cal.3d 465, 85 Cal.Rptr. 629, 636, 467 P.2d 229, 236 (banc 1970).

The *Blevins* court left open the existing common law negligence action. *Duke v. Gulf & Western Mfg. Co.,* 660 S.W.2d 404, 411 (Mo.App.1983).

The problems of what exactly was a design defect surfaced in *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375–77 (Mo. banc 1986), where the Court stated:

To establish liability in a design defect case, the plaintiff bears the burden of demonstrating that the product, as designed, is unreasonably dangerous and therefore "defective", and that the demonstrated defect caused his injuries. Though obviously abbreviated, the foregoing explanation describes the heart and soul of a strict tort liability design defect case—unreasonable danger and causation.

In design defect cases, however, the job of defining and giving content to the legal meaning of "defective" has taxed the creative energies of courts and commentators alike and has led Professor Wade to declare that "the determination of when a product is actionable because of the nature of its design appears to be the most agitated controversial question before the courts in the field of products liability." Wade, On Product Design Defects and Their Actionability, 33 Vand.L.Rev. 551, 576 (1980).

The Court later noted:

Under the decisional law of Missouri, a plaintiff has two options. He can bring his failure to warn case under a theory of negligence, *Morris v. Shell Oil Co.,* 467 S.W.2d 39 (Mo.1971) (adopting the Restatement's Section 388 model of negligent failure to warn), or he can bring his action under Section 402A. *Duke v. Gulf & Western Manufacturing Co.,* 660 S.W.2d at 418.

*Id.* at 383.

■ Simply put, a manufacturing defect occurs when "something goes wrong in the manufacturing process and the product is not in its intended condition." The product is evaluated against the producers' own standards, and compared to like products. *Am Law Prod. Liab. 3rd* § 28:1 p 13. See also *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 365 N.W.2d 176, 181–83 (1984).

In a design-defect case, however, there is no doubt that the product is in the condition intended by the manufacturer. In such case, the "defect" lies in a consciously chosen design. The manufacturer has deliberately added or omitted the challenged component and has presumably made that decision after balancing a variety of factors.

*Bilotta v. Kelley Co., Inc.,* 346 N.W.2d 616, 621 (Minn.1984) *Am Law Prod. Liab. 3rd* § 28:1 p 13. See also *Dierks v. Mitsubishi Motors Corp.,* 208 Cal.App.3d 352, 256 Cal. Rptr. 230, 231 (1 Dist 1989).

Not all cases sounding in strict liability are based on the same type of defect. Some causes of action result from manufacturing defects, when an individual product is improperly assembled; others result from design defects, where the product by the nature of its design is unreasonably dangerous; and others arise from the manufacturer's failure to properly warn or instruct the users of a product.

What becomes evident is that sometimes subtle factual differences, when applied to a failure of a particular product, can appear as both a manufacturing and design defect. Here the plaintiff sought to show the pin was too short and, as a result, could never be staked hard enough to hold. It had to be lengthened and then welded to the assembly, which sounds both of design and, to an extent, manufacturing decisions.

### I. THE EVIDENCE

All the rulings in question concern design evidence which occurred on, or related to, facts after the car's manufacture, but before Richcreek's injury.

### STRICKEN EVIDENCE

The following is a synopsis of the evidence Richcreek introduced that was not allowed to be mentioned in closing argument.

- Gayle Nicholas, a safety engineer at the Lear plant authored a memo stating the 3 millimeter hinge pins "will fall apart if they are not safety welded."

- Nicholas' deposition testimony about the "accordion test":

**Q:** Is it your testimony that during the accordion test where a man simply holds the base of the hinges and pushes in and pulls out that whether the corvette hinge pin at 3 millimeters was staked correctly or not, the hinge pin invariably would pop out?

**A:** Yes.

- Evidence of GM's change of specifications to a 4.5 millimeter pin from the 3 millimeter hinge pin.

- Still-frame photographs of a "crash video" performed by GM in 1988 to test effectiveness of the seats. The videos themselves were in, and stayed in, but individual frames of impact with "crash dummies," and testimony concerning those individual photographs were not allowed to be used by Richcreek in final argument. The tests were on side impacts and the specific effect on the passenger seat.

### EVIDENCE TOTALLY EXCLUDED

- Mark Swanson, a Lear engineer wrote an August, 1990 letter to a GM employee involved in the Corvette seat design saying:

"Because of prior quality safety concerns with pivot pins detaching, Morristown [the site of Lear's assembly plant] has been safety welding the pins to the inner hinge plate at their expense for the past several years."

In his deposition he said:

"Morristown has developed a new longer pivot pin which, once staked, renders safety welding unnecessary."

- Dennis Waddell, material control director of the Lear Morristown plant, testified by deposition that, in 1987, the Corvette hinge pins consistently failed to meet a minimum measure "push-out" test and, as a consequence, safety welding was performed.

\* \* \*

Other evidentiary rulings went against Richcreek based on objections such as failure to provide adequate foundation and the questions being beyond proper rebuttal. Because of the disposition of this case, the accuracy of those rulings will not be addressed.

### II. WERE THE RULINGS CORRECT?

The courts have held a plaintiff may submit on both strict liability and negligence so long as there is no double recovery, saying there is no inconsistency between the two. *Johnson v. Hyster Co.*, 777 S.W.2d 281, 285–86 (Mo.App.1989); *Orrock v. Crouse Realtors, Inc.*, 823 S.W.2d 40, 41 (Mo.App.1991). For example, negligent failure to warn was allowed with strict products liability for a dangerous product and for failure to warn in *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 13 (Mo. banc 1994), and *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 383 (Mo. banc 1986); *Spuhl v. Shiley, Inc.*, 795 S.W.2d 573, 577 (Mo.App.1990).

In a similar vein, the Eastern District in *Lewis v. Envirotech, Corp.*, 674 S.W.2d 105, 112 (Mo.App.1984) allowed a submission on a defective design, *MAI 25.04*, and failure to warn, *MAI 25.05*, both strict liability claims for a defective pump. The court said at page 112: "In such cases, the alternative submissions must not be inconsistent with one another and there must be evidence to support each theory."

In the case at bar, there appears a very fine line between design and manufacturing defects under strict liability. To limit a plaintiff to one theory where no inconsistency exists with others is too restrictive.

Quite often injuries caused by defective products are actionable under several theories; in appropriate products liability cases a plaintiff may submit instructions on alternative theories of recovery where the alternative theories are not inconsistent and there is evidence to support each theory.

*King, Missouri Products Liability (1983),* § 13–12

Another example of the difficulty in assigning a single theory to a set of facts occurred in *Wolff v. Whittaker Marine & Mfg. Co., Inc.*, 484 F.Supp. 1021, 1024–25 (E.D.Mo. 1979), where a houseboat blew up from the ignition of gasoline vapors in the fuel compartment and bilge area. The injured plain-

tiff offered evidence that: 1) the fuel line had a "stress riser" that caused a crack to develop (manufacturing or design); 2) the nut on the connection between the fuel line and a gas tank was insufficiently tightened (manufacturing); and 3) "the placement of the generator in the fuel compartment was inherently dangerous design." The plaintiff was not foreclosed from reliance on a general theory since reliance had been placed on specific defects. *Id.* at 1028.

Still another example of the difficulty in compartmentalizing remedies in product defect cases came in *Hoppe v. Midwest Conveyor Company, Inc.,* 485 F.2d 1196 (8th Cir. 1973). Hoppe was severely injured when a conveyor hoist in a car body plant malfunctioned and he was called upon for repairs. When he attempted to use a manual override, the machine activated. Suit was brought on "strict liability (defective design) and breach of warranty." *Id.* at 1199. The court in ruling for the plaintiff quoted from the California case of *Pike v. Hough,* cited in our Supreme Court's opinions in both *Keener* and *Blevins,* to the effect of there being no rational distinction between design and manufacture. See, e.g., *Kappenman v. Action, Inc.,* 392 N.W.2d 410, 411 (S.D.1986) where the action was for negligence, breach of warranty, and strict liability.

Richcreek pled a design case and offered the previously mentioned evidence of improper design. The fact the staking of the pin may not have been sufficient falls within a design defect and it should have been allowed. Further, the evidence did show a knowledge of problems by the defendant prior to the accident and, had resulted in a corrective action. Cf. *School District of Independence v. U.S. Gypsum Company,* 750 S.W.2d 442, 448 (Mo.App.1988). The rulings are deemed erroneous. The plaintiff pursued a case of strict liability for design defect, and in negligence on the manufacture of the car. She was not required to make an election but was free to pursue all viable theories. *Gosewisch v. American Honda Motor Co.,* 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987). As in *Firestone Tire & Rubber v. Little,* 276 Ark. 511, 639 S.W.2d 726, 731 (1982), the memorandums and letters of Lear to GM on the problems with the hinge pins were relevant to the issue of why and if the pin may have failed.

## III. PREJUDICE

■ Having resolved the question of error on the evidentiary rulings does not resolve the question of whether a reversal is mandated.

> By both statute and rule, an appellate court is not to reverse a judgment unless it believes the error committed by the trial court against the appellant materially affected the action. § 512.160.2; *Rule 84.13(b).*

*Lewis v. Wahl,* 842 S.W.2d 82, 85 (Mo. banc 1992); *Gary v. Politte,* 878 S.W.2d 849, 851 (Mo.App.1994); *Coffman v. Faulkner,* 591 S.W.2d 23, 26 (Mo.App.1979).

The litmus test, whether the improperly excluded evidence would have changed the outcome here, and resulted in an assessment of fault on GM, *Green v. Stanfill,* 641 S.W.2d 490, 492 (Mo.App.1982), is most difficult.

The exclusion of proper evidence is ground for a new trial when the excluded evidence is prejudicial, *State ex rel Mo. Hwy. v. Pedroley,* 873 S.W.2d 949, 954 (Mo.App.1994), and the "exclusion of [proper] evidence is presumed prejudicial unless otherwise shown." *McMillin v. McMillin,* 633 S.W.2d 223, 225 (Mo.App.1982). Furthermore, the evidence excluded "goes to the very heart of the plaintiff's case." *Dorn v. St. Louis Public Service Co.,* 250 S.W.2d 859, 866 (Mo.App.1952). The evidence here was from the manufacturer of the seat, certainly a source disinterested from the plaintiff that "might very well have affected the outcome of the case," on the issue of whether the pin was in a defective condition and unreasonably dangerous, *Menschik v. Mid–America Pipeline Co.,* 812 S.W.2d 861, 865 (Mo.App.1991), had it been presented to the jury. *Dorn,* 250 S.W.2d at 866; *State v. Pedroley,* 873 S.W.2d at 954; *Ozbun v. Vance,* 323 S.W.2d 771, 776 (Mo. App.1959). That there was other evidence of the same general character does not necessarily render the error in exclusion of this evidence harmless. *Id.*

In deciding the effect of the rulings prejudicial, the court is not unmindful that: 1) some of the evidence was actually presented, but not argued, while some was totally away from jury consideration; and 2) the jury may well have decided Richcreek was not in the front seat and, therefore, was not damaged by reason of a defective condition. However, as explained above, to limit a plaintiff on facts such as these to one theory of strict liability when no inconsistency exists and when each theory is adequately supported by the evidence is unduly restrictive.

The judgment is reversed and the case remanded for a new trial on all issues, including punitive damages.

All concur.